241 P.3d 389 (2010)
STATE of Washington, Respondent,
v.
Nathaniel ISH, Appellant.
No. 83308-7.
Supreme Court of Washington, En Banc.
Argued June 29, 2010.
Decided October 7, 2010.
*390 Jodi R. Backlund, Manek R. Mistry, Backlund & Mistry, Olympia, WA, for Appellant.
Kathleen Proctor, Melody M. Crick, Pierce County Prosecutor's Office, Tacoma, WA, for Respondent.
Pamela Beth Loginsky, WAPA, Olympia, WA, amicus counsel for Washington Association of Prosecuting Attorneys.
CHAMBERS, J.
¶ 1 Nathaniel Ish was convicted of second degree felony murder for the beating death of his girl friend, Katy Hall. Prior to trial, the Pierce County prosecutor's office entered into an agreement with Ish's jail cellmate, David Otterson, promising to recommend a reduced sentence for Otterson in another matter in exchange for Otterson's testimony against Ish. Among other things, the agreement provided that Otterson's testimony be truthful. During direct examination of Otterson, the prosecutor referenced the agreement asking if it required Otterson to testify truthfully. Ish argues that the use of the plea agreement and the prosecutor's reference to Otterson's promise to testify truthfully amounted to improper prosecutorial vouching for the witness's credibility. We agree that it was error to permit the prosecutor to introduce evidence during the State's case in chief that the agreement required Otterson to testify truthfully. However, we conclude that under the facts of this case, the error was harmless. We affirm.

FACTS AND PROCEDURAL HISTORY
¶ 2 Ish and Hall began a relationship while in a drug treatment program together. After leaving the program, Ish and Hall moved in with Hall's mother, Ilona Lynn. One night, Lynn was watching television in her dining room when she heard bumping noises coming from Hall's bedroom. Ish and Hall were both in the bedroom at the time, and Lynn, who was in a wheelchair, went to investigate the noise. After calling to Hall through the closed bedroom door and receiving no response, Lynn forced the door open and saw Hall on the floor, covered in blood. Lynn called her granddaughter, Brittanee Hall, asking her to come over immediately and help. When Brittanee arrived at the house a short time later, she went to Hall's bedroom door and called for her. Hall did not respond, but through the closed door, Ish yelled, "I killed her." Verbatim Report of Proceedings (VRP) (5/2/2007) at 274.
¶ 3 Brittanee went outside and called the police and several family members. Before the police arrived, Ish came out onto the porch, where Lynn was, and began threatening some of the family members who had been called to the house. Brittanee testified that his comments did not seem out of touch with reality and that he clearly recognized the members of Hall's family who were there.
¶ 4 When police officers arrived they found Ish on the front porch sitting with Lynn. Ish was acting aggressively and screaming nonsensically. He was uncooperative, refused to follow police commands, and struggled as officers attempted to detain him. During the struggle, officers used a stun gun on multiple occasions to try and subdue Ish; one officer described Ish's resistance as "some type of superhuman strength." VRP (5/3/07) at 415. After successfully detaining Ish, officers entered the house and found Hall dead in the hallway. It was later determined that Hall's death was caused by multiple blunt force injuries.
¶ 5 Ish was arrested. While being transported to the Lakewood police station, he continued yelling irrationally and acting aggressively. He was eventually taken to the hospital, where he was sedated and treated for injuries. When he awoke a few hours later, he appeared calm and asked why he was at the hospital. After being read his Miranda[1] rights, Ish was polite and agreed to speak with officers. When asked if he knew who Hall was, Ish said that he did and then asked, "How is she?" A subsequent *391 urine test would show that Ish had cocaine, methamphetamine, and marijuana in his system.
¶ 6 Ish was charged with first degree murder and second degree felony murder.[2] Clerk's Papers at 1-2. He did not deny that he had assaulted and killed Hall. His defense at trial was that the drugs he had taken, along with his bizarre behavior, demonstrated that he had not formed the required mental state for either crime.
¶ 7 The State introduced evidence to show that Ish had formed the required mental state for both crimes. Prior to trial, the State entered into a plea agreement with Ish's jail cellmate, Otterson. Otterson had been charged with first degree robbery, second degree theft, and second degree assault in another matter. In return for Otterson's testimony at Ish's trial, the State agreed to, among other things, reduce the charges against Otterson to a single charge of second degree robbery and to recommend a reduced sentence. Agreement Between Pierce County Prosecutor's Office & David Otterson (agreement), Def.'s Ex. 121. Otterson testified that while in jail, Ish had told him details he remembered about the crime but said that "he was going to just say he didn't remember anything at all that happened that night, just like it never happened." VRP (5/9/07) at 1095. Otterson's testimony was offered on the issue of Ish's state of mind when he assaulted and killed Hall.
¶ 8 The agreement between Otterson and the State was apparently drafted by one of the prosecutors in Otterson's case. It contains numerous self-serving statements, including that Otterson agree to provide "a complete and truthful statement," to "testify truthfully," and to "have told the truth, to the best of his knowledge." Agreement at 2 (emphasis added). The agreement also contained a provision that required Otterson to submit to a polygraph examination should the State request one. The State never requested the polygraph examination.
¶ 9 Prior to Otterson's testimony, the parties argued about the admissibility of the agreement and the extent to which they would be allowed to explore its terms during oral examination. In particular, defense counsel argued that self-serving statements regarding Otterson's agreement to testify truthfully should be redacted from the agreement and that the State should not be "allowed to rehabilitate [Otterson] on direct examination or redirect by saying, `Well, you are required to testify truthfully, aren't you.'" VRP (5/9/07) at 1081. Defense counsel did, however, want to reference portions of the agreement during cross examination in order to impeach Otterson.[3]
¶ 10 The State, on the other hand, wanted to reference Otterson's agreement to tell the truth during its case in chief.[4] Over objection, the court concluded that the State could establish the terms of the agreement during direct examination, including its requirement that Otterson tell the truth while testifying. However, the court also cautioned that it would not allow the State to argue that Otterson was only being allowed to testify because he was complying with that term of the agreement.
¶ 11 During the State's case in chief, the following exchange between the prosecutor and Otterson took place:
Q: With regard to exchanging testimony in this case, what type of testimony?
A: Truthful testimony.
*392 VRP (5/9/07) at 1104. The defendant did not object to this questioning.
¶ 12 Later, after Ish attacked Otterson's credibility on cross-examination, the follow exchange took place between the prosecutor and Otterson on re-direct:
Q: . . . as you sit here today, do you know if in fact that agreement is going to be revoked or not?
A: No, I don't.
Q: One of the terms of your plea agreement, which [the defense attorney] has gone over with you, is that you testified truthfully?
A: Yes.
Q: Have you testified truthfully?
A: Yes, I have.
VRP (5/10/07) at 1153. Nothing further was said with regard to Otterson's agreement to tell the truth during his testimony.
¶ 13 The jury convicted Ish of second degree felony murder and possession of a controlled substance.[5] The jury did not find Ish guilty of first degree murder. The Court of Appeals affirmed in an opinion published in part. State v. Ish, 150 Wash.App. 775, 208 P.3d 1281 (2009). Ish sought discretionary review in this court, raising a number of issues. We granted review on only the issue of whether the prosecutor's reference to Otterson's promise to testify truthfully amounted to prosecutorial vouching. State v. Ish, 167 Wash.2d 1005, 220 P.3d 783 (2009).

ANALYSIS
¶ 14 Ish claims the prosecutor committed misconduct by vouching for Otterson's credibility when she referenced his agreement to testify truthfully. He argues his due process rights under the Fourteenth Amendment to the United States Constitution were violated and that our review should be de novo. But we have repeatedly held that "[a]llegations of prosecutorial misconduct[[6]] are reviewed under an abuse of discretion standard." State v. Brett, 126 Wash.2d 136, 174-75, 892 P.2d 29 (1995) (citing State v. Hughes, 106 Wash.2d 176, 195, 721 P.2d 902 (1986)); see also State v. Stenson, 132 Wash.2d 668, 718, 940 P.2d 1239 (1997). Evidentiary rulings are also reviewed for an abuse of discretion. State v. McDonald, 138 Wash.2d 680, 693, 981 P.2d 443 (1999); accord State v. Green, 119 Wash.App. 15, 23, 79 P.3d 460 (2003). Generally, to prevail on a claim of prosecutorial misconduct, the defendant bears the burden of showing that the comments were improper and that they were prejudicial. State v. Warren, 165 Wash.2d 17, 26, 195 P.3d 940 (2008) (citing State v. Yates, 161 Wash.2d 714, 774, 168 P.3d 359 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2964, 171 L.Ed.2d 893 (2008)). The trial judge is generally in the best position to determine whether the prosecutor's actions were improper and whether, under the circumstances, they were prejudicial. See State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006). Consistent with these prior cases, our review is for an abuse of discretion.[7]
¶ 15 Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony. United States v. Brooks, 508 F.3d 1205, 1209 (9th Cir.2007) (quoting United States v. Hermanek, 289 *393 F.3d 1076, 1098 (9th Cir.2002)). "It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness." Warren, 165 Wash.2d at 30, 195 P.3d 940 (citing Brett, 126 Wash.2d at 175, 892 P.2d 29). Whether a witness has testified truthfully is entirely for the jury to determine. Brooks, 508 F.3d at 1210 (quoting United States v. Ortiz, 362 F.3d 1274, 1279 (9th Cir.2004)).
¶ 16 Here, Ish argues that improper vouching occurred when the trial court permitted the jury to consider Otterson's plea agreement and when the prosecutor asked Otterson on direct examination about his promise to testify truthfully. He claims that through introduction of Otterson's "promise to testify truthfully in return for reduced charges, the prosecution suggested that jurors should believe Otterson." Pet'r's Suppl. Br. at 17. The agreement, according to Ish, "suggested that the prosecutor had some objective method . . . of verifying Otterson's testimony" and allowed the jury to infer that "if the prosecutor did not believe the testimony, she would not have allowed him the benefit of his plea bargain." Id. at 15.
¶ 17 In Green, the Court of Appeals held that it was error for a trial court to admit an immunity agreement between the State and a witness where language in the agreement stated its intent was to "secure the true and accurate testimony" of the witness. Green, 119 Wash.App. at 23-24, 79 P.3d 460. Specifically, the Green court found that a provision in the agreement stating the witness agreed to "`testify truthfully' should have been redacted if such a request had been made." Id. at 24, 79 P.3d 460. The court concluded that the State could have introduced the agreement on redirect had the witness's credibility been impeached on cross examination, but that it was inadmissible absent such an attack. Id.
¶ 18 The reasoning employed in Green followed, in part, from that of a Ninth Circuit case, United States v. Roberts, 618 F.2d 530 (9th Cir.1980). Under similar circumstances, the Roberts court, in dicta,[8] expressed concern over admitting plea agreements containing promises to testify truthfully. Id. at 535. The court stated:
A strong case can be made for excluding a plea agreement promise of truthfulness. The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.
Id. at 536. The court indicated the proper test for admissibility of a witness's plea agreement would be to weigh its probative value against its prejudicial impact. Id.; see also State v. Jessup, 31 Wash.App. 304, 316, 641 P.2d 1185 (1982) (trial court should examine an immunity agreement and excise any irrelevant or prejudicial provisions).
¶ 19 Similarly, courts have found that a witness's testimony that they were speaking the truth and living up to the terms of their plea agreement may amount to a mild form of vouching. Brooks, 508 F.3d at 1210. As with the initial admission of the plea agreement itself, such testimony suggests that the witness might have been compelled to tell the truth by the prosecutor's threats and the State's promises. Id. It may imply that "`the prosecutor can verify the witness's testimony and thereby enforce the truthfulness condition of its plea agreement.'" Id. (quoting United States v. Wallace, 848 F.2d 1464, 1474 (9th Cir.1988)).
¶ 20 The Court of Appeals expressly declined to follow the reasoning of Green and Roberts, but we share the concerns expressed in both cases. Presumably, prosecutors know that the contents of an agreement made in exchange for testimony may become an exhibit or the subject of testimony at trial, *394 and there is a natural temptation to insert self-serving language into these agreements. Evidence that a witness has promised to give "truthful testimony" in exchange for reduced charges may indicate to a jury that the prosecution has some independent means of ensuring that the witness complies with the terms of the agreement. While such evidence may help bolster the credibility of the witness among some jurors, it is generally self-serving, irrelevant, and may amount to vouching, particularly if admitted during the State's case in chief. "[P]rosecutorial remarks implying that the government is motivating the witness to testify truthfully: . . . `are prosecutorial overkill.'" Roberts, 618 F.2d at 536 (alteration in original) (quoting United States v. Arroyo-Angulo, 580 F.2d 1137, 1150 (2d Cir.1978) (Friendly, J., concurring)). We agree with the court's conclusion in Green that evidence that a witness has agreed to testify truthfully generally has little probative value and should not be admitted as part of the State's case in chief. Evidence is not admissible merely because it is contained in an agreement, and reference to irrelevant or prejudicial matters should be excluded or redacted. Green, 119 Wash.App. at 24, 79 P.3d 460; see also Jessup, 31 Wash. App. at 316, 641 P.2d 1185; Roberts, 618 F.2d at 536.
¶ 21 A defendant may, however, impeach a witness on cross-examination by referencing any agreements or promises made by the State in exchange for the witness's testimony. During such cross-examination, the agreement may be marked as an exhibit, but not necessarily admitted, and relevant portions may be disclosed to the jury. If the agreement contains provisions requiring the witness to give truthful testimony, the State is entitled to point out this fact on redirect if the defendant has previously attacked the witness's credibility. Courts should carefully scrutinize such agreements and exclude language that is not relevant to the defendant's impeachment evidence or tends to vouch for the witness's testimony. While the State may ask the witness about the terms of the agreement on redirect once the defendant has opened the door, prosecutors must not be allowed to comment on the evidence, or reference facts outside of the record, that implies they are able to independently verify that the witness is in fact complying with the agreement. And absent an attack on the witness's credibility by the defense, such references should be excluded even on redirect examination.
¶ 22 Here, Ish argues that the State should not have been allowed to ask Otterson about his promise to testify truthfully during direct examination.[9] We agree. On direct review, where the credibility of the witness had not previously been attacked, referencing Otterson's out-of-court promise to testify truthfully was irrelevant and had the potential to prejudice the defendant by placing the prestige of the State behind Otterson's testimony. We hold that the trial court abused its discretion by denying Ish's pretrial motion to preclude the State from referencing the portions of Otterson's plea agreement requiring him to testify truthfully before his credibility was attacked by the defense.[10]
¶ 23 We do not, however, have any difficulty concluding that the error in this *395 case was harmless. As noted above, and contrary to Ish's claims of constitutional error, to prevail on a claim of prosecutorial misconduct, the defendant bears the burden of showing that the comments were improper and that they were prejudicial. Warren, 165 Wash.2d at 26, 195 P.3d 940. "In order to prove the conduct was prejudicial, the defendant must prove there is a substantial likelihood the misconduct affected the jury's verdict." State v. Korum, 157 Wash.2d 614, 650, 141 P.3d 13 (2006) (citing In re Pers. Restraint of Pirtle, 136 Wash.2d 467, 481-82, 965 P.2d 593 (1998)). Ish claims that he was prejudiced by the prosecutor's bolstering of Otterson's testimony because the sole issue at trial was Ish's mental state, and Otterson's testimony was offered to show that Ish had admitted he was aware of his actions at the time of the assault. According to Ish, by referencing his agreement to testify truthfully, the prosecutor suggested that the jury should believe Otterson and his testimony regarding Ish's mental state.
¶ 24 Although we believe it was error to allow the State to reference the agreement during direct examination, the impact of the error, if any, was slight. Contrary to Ish's contention, Otterson's testimony was not the only evidence tending to prove Ish possessed the required mental state at the time of the assault. The State produced many witnesses who were present just after the assault, who described Ish as angry but not out of touch with reality. The State also produced a recording from an emergency response service used by Lynn captured some of Ish's statements before the police arrived. On the recording, Ish appeared calm and rational. And while the prosecutor should not have been allowed to reference the terms of Otterson's agreement on direct, once Ish attacked Otterson's credibility on cross the State was free to raise Otterson's promise to testify truthfully on redirect. The prosecutor asked only two questions about this part of the agreement and did not dwell on the issue. Ish has failed to demonstrate a substantial likelihood that the error affected the jury's verdict.

CONCLUSION
¶ 25 Evidence that a witness has entered into a formal agreement with the State to testify truthfully should be excluded during direct examination. Once the witness's credibility has been attacked during cross-examination, the prosecutor may reference the witness's promise to testify truthfully on redirect. However, such evidence should be limited, and the prosecutor may not express a personal belief regarding the witness's credibility or imply that evidence outside of the record would ensure that the promise has been kept.
¶ 26 We conclude that the trial court erred when it allowed the State to reference Otterson's promises in the plea agreement to testify truthfully during direct examination. However, we also conclude that the error in this case was harmless. The conviction is affirmed.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON and GERRY L. ALEXANDER, Justices.
STEPHENS, J., (concurring).
¶ 27 I agree with the lead opinion that the Court of Appeals should be affirmed, but disagree with its reasoning. The lead opinion holds that the State's questioning of David Otterson about his plea agreement to testify truthfully was harmless error. I would hold that it was not error.

ANALYSIS
¶ 28 Although the parties discuss the plea agreement's "testify truthfully" language mainly as a matter of improper prosecutorial vouching, I agree with the lead opinion that we should deal with this issue as previous Court of Appeals cases have: using the balancing test of Evidence Rule (ER) 403. See State v. Green, 119 Wash.App. 15, 23-24, 79 P.3d 460 (2003); State v. Jessup, 31 Wash. App. 304, 315-16, 641 P.2d 1185 (1982). Certainly, evidence of "testify truthfully" language may be unfairly prejudicial to the extent it implies that the State can assure that the witness is telling the truth. When prosecuting attorneys' offices draft plea agreements, *396 they can include self-serving language that has no probative value at trial.
¶ 29 However, under ER 403, we should weigh the prejudice engendered by the "testify truthfully" language in a plea agreement against the State's legitimate purposes for questioning a witness about a plea agreement. When the State offers a witness who has agreed to testify as part of a plea agreement, the existence of a "deal" is an obvious ground for impeachment. It shows potential bias and motivation to lie. There is even the possible inference that the State offered the witness the plea agreement to procure fraudulent testimony implicating the defendant. In the face of obvious (and damning) lines of questioning on cross-examination, the prosecutor in this case wished to present Otterson's testimony in its true contextas part of a plea deal in exchange for truthful testimony. By questioning Otterson on direct examination about this issue, the prosecutor intended to "pull the sting" from the anticipated cross examination.
¶ 30 We have previously approved of similar trial strategy under ER 403. In State v. Bourgeois, 133 Wash.2d 389, 402-03, 945 P.2d 1120 (1997), a State's witness, Frank Rojas, had given inconsistent statements about whether the defendant committed the crime. On direct examination, the State questioned Rojas about his fear of the defendant as the reason for the inconsistencies. The same line of questioning was error as to other witnesses, whose credibility was not at issue. Id. at 401-02, 945 P.2d 1120. However, it was not error as to Rojas "because his credibility was attacked. Although the attack occurred after Rojas was directly examined by the State, it was reasonable for the State to anticipate the attack and `pull the sting' of the defense's cross-examination." Id. at 402, 945 P.2d 1120. We explained:
"A trial is not just combat; it is also truth-seeking; and each party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on. It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will do so on cross-examination. What is sauce for the goose is sauce for the gander."
Id. (quoting United States v. LeFevour, 798 F.2d 977, 984 (7th Cir.1986)). Because the defense's "line of cross-examination was to be anticipated," the prosecution could present Rojas's testimony in the context of his prior inconsistent testimony and his fear of the defendant "to blunt the impact of [the defendant's] cross-examination." Id. at 403, 945 P.2d 1120. Here, as in Bourgeois, the State's questioning about the plea agreement "anticipated" and "blunt[ed] the impact" of the defense's argument that Otterson was lying to secure the benefit of the plea or that the State induced Otterson to lie to help convict the defendant.[1]
¶ 31 Although the State's reference to the "testify truthfully" requirement of a plea agreement serves a legitimate purpose under ER 403 and Bourgeois, it is also prejudicial. The prejudice arising from the implication that the State can somehow verify a witness's truthfulness may be compounded by self-serving language in the plea agreement, which is an adversarial document prepared in anticipation of litigation. Some limits on the State's ability to put the terms of the plea agreement in evidence on direct examination are therefore appropriate.
¶ 32 In Green, the Court of Appeals struck the right balance. 119 Wash.App. at 23-24, 79 P.3d 460. Because of the prejudicial language in a plea agreement securing a witness's testimony, Green held that the State could not offer the plea agreement as an exhibit during its direct examination. Id. The State contended that it should be able to "pull the sting" of the defense's impeachment on cross-examination by introducing the plea *397 agreement on direct examination. Green rejected this argument: the State could "pull the sting" by asking questions on direct examination to set up the context of the testimony but could not introduce the plea agreement, with its self-serving language, unless the defense opened the door on cross-examination. Id. at 24, 79 P.3d 460. "This approach. . . allows the State to inquire in its direct examination about the existence of an agreement and the witness's reasons for cooperating to avoid an appearance that it is attempting to conceal information from the jury." Id.
¶ 33 Green's resolution of the issue makes sense because it prevents the jury from hearing the prejudicial language of the agreement unless the defense opens the door. But, it also allows the State to present the witness's testimony for what it is, avoiding a "bombshell" during cross-examination. By placing the witness's testimony in its real context, the rule in Green best allows the jurors to appraise its credibility. In other words, it serves ER 403's goals by allowing probative information to come in while limiting prejudice as much as possible.[2]
¶ 34 At trial in this case, the defense and the prosecution argued over whether the plea agreement would be admissible as an exhibit during the State's direct examination. Verbatim Report of Proceedings (VRP) at 1079-80. The State agreed not to admit the plea agreement, but wished to question Otterson about it. The defense objected to any question regarding Otterson's agreement to testify truthfully as self-serving prosecutorial vouching. Id. at 1080-81. The trial court ruled that, so long as the State did not suggest that it was vouching for Otterson's credibility by allowing him to testify, the State could point out the terms of the plea agreement. "Otherwise," the trial court stated, "the defense will be dangling the possibility that the State has an agreement that says `You can lie as much as you want to. We just want you to get up there and testify.'" Id. at 1081-82.
¶ 35 During the State's direct examination of Otterson, the prosecutor asked about his contact with law enforcement regarding Ish's case. Id. at 1101-07. In eliciting Otterson's description of his plea agreement, the following brief exchange occurred:
Q. What happened at the start of your trial in October?
A. I was offered a plea agreement where I pled to a second degree robbery if I exchanged testimony in this case.
Q. With regard to exchanging testimony in this case, what type of testimony?
A. Truthful testimony.
Id. at 1104. This was the sum total of the testimony on direct examination regarding the witness's agreement to testify truthfully. After the defense thoroughly cross-examined Otterson about the plea agreement, the prosecutor reiterated a similar exchange on redirect examination. Id. at 1153.
¶ 36 These questions merely placed the witness's testimony in context for the jury and did not suggest that the prosecutor was verifying or vouching for its truth.[3] I would hold that the prejudice engendered by this exchange did not substantially outweigh its probative value, and the trial court did not abuse its discretion under ER 403 in allowing this testimony. I would affirm the Court of Appeals.

CONCLUSION
¶ 37 It is not error for the State to "pull the sting" on direct examination of a witness by asking questions about the context of a plea agreement, including the fact that the plea agreement was in exchange for truthful testimony. The limited questioning in this *398 case and trial court's statements show that the parties were aware of, and properly minimized, the prejudice arising from such an exchange. I would affirm the Court of Appeals.
WE CONCUR: SUSAN OWENS, MARY E. FAIRHURST, and JAMES M. JOHNSON, Justices.
SANDERS, J., (dissenting).
¶ 38 I firmly agree with the lead opinion that the trial court erred by allowing the State, during direct examination, to reference the truth-telling condition of the informant's plea agreement; however, I cannot join the lead opinion's ill-reasoned decision that this error was harmless. Nathaniel Ish was deprived of a fundamental American right  the right to a fair trial before an impartial and untainted jury; by definition, loss of a protected right is not harmless.[1]
¶ 39 "`A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.'" In re Det. of Pouncy, 168 Wash.2d 382, 391, 229 P.3d 678 (2010) (quoting State v. Britton, 27 Wash.2d 336, 341, 178 P.2d 341 (1947)). This court held "an error is presumed prejudicial unless we conclude the error could not have rationally affected the verdict." State v. DeRyke, 149 Wash.2d 906, 912, 73 P.3d 1000 (2003); State v. Clark, 143 Wash.2d 731, 775-76, 24 P.3d 1006 (2001). If a reasonable possibility exists, that in the absence of the error, the verdict might have been more favorable to the accused, it cannot be harmless. There is absolutely no way to determine if the prosecutor's vouching for David Otterson enhanced his trustworthiness in the minds of the jurors, thereby increasing the likelihood that the jury would find his testimony on Ish's state of mind more credible.
¶ 40 A reviewing court cannot determine what evidence or instruction influenced the jury's decision. Dennis J. Sweeney, An Analysis of Harmless Error in Washington: A Principled Process, 31 Gonz. L.Rev. 277 (1995-96). "[N]o court knows what influenced a particular jury's verdict of guilt in any particular case." United States v. Antonelli Fireworks Co., 155 F.2d 631, 647 (2d Cir.1946) (Frank, J., dissenting). A jury is "made up of human beings, whose condition of mind cannot be ascertained by other human beings. Therefore, it is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors." State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946). This court cannot possibly ascertain how much the prosecutor's vouching for Otterson swayed the jury.[2]
¶ 41 At least one member of the jury was likely tainted when the State asked Otterson about his promise to testify truthfully during direct examination. "[S]uch testimony suggests that the witness might have been compelled to tell the truth by the prosecutor's threats and the State's promises." Lead opinion at 393 (citing United States v. Brooks, 508 F.3d 1205, 1210 (9th Cir.2007)). It is entirely for the jury to consider whether a witness has testified truthfully.[3]Id. at 393-94; see United States v. Ortiz, 362 F.3d 1274 (9th Cir.2004). "Evidence that a witness has promised to give `truthful testimony' in exchange for reduced charges may indicate *399 to a jury that the prosecution has some independent means of ensuring that the witness complies with the terms of the agreement. While such evidence may help bolster the credibility of the witness among some jurors, it is generally self-serving, irrelevant, and may amount to vouching, particularly if admitted during the State's case in chief." Lead opinion at 394.
¶ 42 The State's case relied heavily on the testimony of Otterson. The sole issue at trial was Ish's mental state, and Otterson's testimony was offered to show Ish had admitted he was aware of his actions at the time of the assault. Lead opinion at 391. Otterson's testimony was an important part of the State's proof that Ish possessed the required mental state for both crimes.[4]Id. at 390, 391. Other evidence presented by the State was corroborative of Otterson's testimony,[5] but not highly probative of his mental state. We cannot ascertain whether the jury would have reached the same result had the prosecutor not vouched for this jailhouse informant.
¶ 43 I dissent.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Ish was also charged with and convicted of possession of a controlled substance. That conviction is not challenged here.
[3] Otterson failed to comply with many of the conditions of the agreement.
[4] The State presented the trial court a copy of the agreement with the polygraph provision redacted. The trial court had previously ruled during motions in limine that reference to the polygraph provision of the agreement would be excluded. The court reasoned that the State's decision to not have Otterson examined was irrelevant as to whether Otterson was in fact telling the truth. The court was concerned that referencing the polygraph provision and the State's decision not to examine Otterson would put the prosecutor's subjective belief as to whether Otterson was telling the truth into issue. A copy of the redacted agreement was marked as an exhibit and is the only one contained in the record. The parties agreed that the agreement would not go to the jury.
[5] Ish was also found guilty of manslaughter, but the court vacated the conviction, concluding that it merged with murder in the second degree.
[6] The Washington Association of Prosecuting Attorneys (WAPA) filed an amicus curiae brief in this case asking that we adopt the term "prosecutorial error" rather than "prosecutorial misconduct." WAPA argues that "prosecutorial misconduct" should be reserved for conduct intended to violate the Constitution or for violations of specific ethical requirements. WAPA urges that using the term "prosecutorial error" allows courts to distinguish between deliberate violations of a rule or practice and common missteps that all lawyers make on occasion. While certainly some errors are unintentional and some instances of prosecutorial misconduct are more egregious than others, we decline to start drawing fine lines between error and misconduct.
[7] The trial judge entered detailed pretrial evidentiary rulings that, in effect, dictated how the prosecutor would present this problematic evidence. Abuse of discretion, not de novo, is appropriate.
[8] Roberts held that the prosecutor committed misconduct when, during closing argument, he told the jury that the State's chief witness would not lie for fear of voiding his plea agreement and that a police detective was in the courtroom to monitor testimony. 618 F.2d at 532. The section in Roberts addressing the admission of a witness's plea agreement begins: "In the event of a retrial, the district court may benefit from some guidance." Id. at 535. The discussion is thus dicta.
[9] The plea agreement itself was not admitted as an exhibit in this case. However, in cases where these kinds of plea agreements are admitted as exhibits, irrelevant and prejudicial information should be redacted.
[10] Although a party is generally not entitled to rehabilitate a witness until after the witness's credibility has been impeached, under certain circumstances, the State may attempt to preemptively "pull the sting" out of an anticipated attack during its case in chief. State v. Bourgeois, 133 Wash.2d 389, 402, 945 P.2d 1120 (1997). But anticipatory rehabilitation should be limited to those circumstances where there is little doubt the defendant is going to open the door to the otherwise inadmissible evidence on cross-examination. Here the trial court did not ground its ruling upon a conclusion that referencing Otterson's promise to testify truthfully would rebut evidence likely to come out during his cross-examination. First, it is not the kind of adverse evidence that one would generally want to take the sting out of by acknowledging it first. Second, the judge did not base his ruling that Otterson's promise to tell the truth was going to come in anyway. Rather, the judge explained his ruling by stating, "Otherwise, the defense will be dangling the possibility that the State has an agreement that says `you can lie as much as you want to . . .' that just wouldn't be fair." VRP (5/9/07) at 1082.
[1] This conclusion follows more readily in this case than in Bourgeois. In Bourgeois, it was assumed that the defense would have impeached Rojas on the basis of his inconsistent statements had the State not mentioned them on direct examination. In this case, Ish's defense attorney affirmatively stated that he would use the plea agreement during cross-examination. Verbatim Report of Proceedings (VRP) at 1080. Beyond merely anticipating the cross-examination, the State was told that impeachment based on the plea agreement was coming.
[2] Of course, a trial court has discretion to limit the State's questioning regarding a plea agreement to avoid prosecutorial vouching. The prosecutor cannot simply read the plea agreement aloud as a series of questions. What is probative is the fact that the witness is testifying pursuant to a plea agreement in which the State asked for truthful testimony, not the language of any provision in particular.
[3] The lead opinion agrees that the exchanges were brief and that the prosecutor did not dwell on the "testify truthfully" issue; for this reason it finds the error harmless. See lead opinion at 394-95. Puzzlingly, the lead opinion does not apply this understanding during its ER 403 analysis to conclude that the minor prejudice did not outweigh the testimony's probative value.
[1] state attempts to safeguard the life and liberty of its citizens by securing to them certain legal rights. These rights should be impartially preserved. They cannot be impartially preserved if the appellate courts make of themselves a second jury and then pass upon the facts. One of the first propositions of the orderly administration of law is that a defendant, either guilty or innocent, shall be accorded a fair trial.
State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946).
[2] and to what extent an error influenced a given jury verdict is therefore necessarily an exercise in judicial speculation  perhaps principled or reasoned speculation, but nonetheless speculation, about what a jury would or would not have done with or without the offending evidence, instruction, or comment. While much has been written about what does or does not influence juries, what influences a particular case can simply never be discovered.
Sweeney, supra, at 280.
[3] It is undisputed that the government is prohibited from placing the "prestige of the United States behind a witness by making personal assurances of credibility." United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir.2000).
[4] "`In capital murder cases, snitches are the No. 1 factor, being present in 45 percent of wrongful convictions identified since 1976.' Warden said. `When I define snitch, by the way, I don't mean just anybody who's in jail, but anybody who has an incentive to testify a certain way.'" Tom McNamee, New lessons from an old mystery, Chicago Sun-Times, Jan. 1, 2006 (quoting Rob Warden, Wilkie Collins's The Dead Alive: The Novel, the Case, and Wrongful Convictions (2005)) (Rob Warden is executive director of the Center on Wrongful Convictions, Bluhm Legal Clinic, Northwestern University School of Law), available at http://www.law.northwestern.edu/ wrongfulconvictions/resources/ readings/Sun-TimesReview.pdf (last visited Sept. 27, 2010).
[5] though the use of informants is widespread  the feds gave $100 million to snitches in one recent year  their reliability is dubious. Many defendants, desperate to give up information in exchange for reduced sentences, provide cops with bogus leads. This results in the prosecution of innocents, many of whom plead guilty (out of fear) to crimes they did not commit. Those who fight such charges don't fare well: Nearly half of wrongful capital convictions can be traced to false testimony from informants, according to one Northwestern University study.
Ryan Blitstein, The Inside Dope on Snitching, MILLER-McCUNE, Oct. 23, 2009, available at http:// www.miller-mccune.com/legal-affairs/the-inside-dope-on-snitching-3387/ (last visited Sept. 27, 2010).