IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34981-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CARISSA DANELLE CANNON, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Carissa Cannon appeals her conviction for first degree robbery, arguing the trial court violated her confrontation right when it excluded terms of a plea agreement entered into by her partner in the robbery, who agreed to testify against her in exchange for a possible 147-month reduction in his sentence. She also argues for the first time on appeal that the trial court failed to conduct a *Blazina*[1] inquiry into her ability to pay legal financial obligations (LFOs).

The trial court imposed limits on only the State's direct examination about terms of the plea agreement; the defense was unconstrained. No violation of the confrontation clause is shown. The *Blazina* error she alleges was not preserved. We affirm.

---

[1] *State v. Blazina*, 182 Wn.2d 827, 833, 344 P.3d 680 (2015).

## FACTS AND PROCEDURAL BACKGROUND

At the conclusion of a blind date with a woman Ludwin Borgen knew only as Aliyah, Mr. Borgen drove her to the home of her friends, where she bought methamphetamine. Unbeknownst to Mr. Borgen, she also agreed to a plan to set him up for a robbery. Upon leaving the home with Aliyah, Mr. Borgen drove only 500 feet before realizing his back tires had been slashed. Aliyah, expressing a concern that she "had warrants," left at that point and never returned. Report of Proceedings (RP) at 256. As Mr. Borgen worked to replace one of his damaged tires with his spare, he was approached by the defendant, Carissa Cannon, and her boyfriend, Samuel Jackson, who was a resident of the home Mr. Borgen and Aliyah had just visited. Both Ms. Cannon and Mr. Jackson were dressed in black and armed.

Ms. Cannon and Mr. Jackson ordered Mr. Borgen to walk to a nearby alley, which he did, at gunpoint. Once there, they had him empty his pockets. Ms. Cannon collected cash, a wallet, two cell phones, a flashlight, a half pack of cigarettes, and a lighter from him. She then demanded "the drugs," telling Mr. Borgen, when he denied having any, that Aliyah said he did. RP at 272. She said, "If you don't give me the drugs, I'm going to pop you," and moved her hand as if prepared to shoot him. *Id.* Mr. Borgen insisted that it was Aliyah, not him, who purchased drugs, and maybe she left them in his car. At that point, Ms. Cannon returned to Mr. Borgen's car to look for drugs, trading the Ruger

2

.22 caliber handgun she had been carrying for what turned out to be a BB gun with which Mr. Jackson had been armed.

Mr. Jackson walked Mr. Borgen further down the alley, and when it opened into a parking lot, Mr. Borgen saw two police patrol cars nearby. Mr. Jackson had turned around, evidently watching for Ms. Cannon, and Mr. Borgen took the opportunity to run toward the patrol cars, yelling that he had just been robbed. He directed the attention of the first officer with whom he spoke to Mr. Jackson, who was fleeing. The officer caught up with Mr. Jackson, detained him, and radioed other officers that the victim's car and an involved female should be found nearby. A second officer found Ms. Cannon sitting in the driver's seat of Mr. Borgen's car. Upon searching her and the car, he found a BB gun under the front passenger seat; Mr. Borgen's wallet in the back seat, emptied of what Mr. Borgen later testified had been $400-$500 in cash; and Mr. Borgen's cell phones in Ms. Cannon's pockets. Mr. Borgen was able to identify Ms. Cannon and Mr. Jackson as the people who robbed him. Cash in the amount of $380 was found in the back pocket of Ms. Cannon's jeans when she was booked into jail.

The State charged Ms. Cannon and Mr. Jackson with first degree robbery. Mr. Jackson entered into a plea agreement with the State, in which he agreed to testify against Ms. Cannon.

At trial, before the State called Mr. Jackson to testify, the prosecutor raised a concern outside the presence of the jury about how far she could go into the details of his

3

plea agreement, specifically mentioning *State v. Ish*, 170 Wn.2d 189, 241 P.3d 389 (2010). In that case, all nine members of the Washington Supreme Court agreed that promises to "testify truthfully" that are commonly included in plea agreements can be written by prosecutors in a self-serving fashion and are prejudicial if jurors understand them to mean the State has some means of ensuring that the witness will comply and testify truthfully. *Id.* at 198, 203-04, 207. A majority of the court, consisting of the four justices who signed the lead opinion and the dissenting justice, analyzed the issue as one of prosecutorial vouching and agreed it was an abuse of discretion for the court to deny a defense objection to such evidence in the State's case-in-chief. The four other justices would have analyzed prejudice on a case-by-case basis, applying ER 403.

In raising her concerns about the issue in this case, the prosecutor told the court, "I don't want to step into anything I'm not supposed to step into." RP at 383.

After hearing from both parties and rereading *Ish*, the trial court told the parties:

> THE COURT: . . . I went back and read [*Ish*], the Supreme Court version, a little more carefully and it actually points out problems in having the state introduce the requirement that the defendant testify truthfully in the direct examination. They did allow it in that case by way of cross-examination, but the specific language in the opinion is that the state could not offer the plea agreement as an exhibit during its direct examination.
> [PROSECUTOR]: You can use it as an exhibit, but not offer it up.
> THE COURT: Correct. There was language potentially in the plea agreement regarding the agreement to testify truthfully as self-serving vouching, unless the defense is implying on cross-examination attacking the witness's credibility, and then the state can inquire: Did you have a requirement to testify? Yes. On what kind of testimony does that have to be? It needs to be truthful testimony in compliance with the agreement.

4

No. 34981-1-III
*State v. Cannon*

[PROSECUTOR]: Okay. So can only bring that up on redirect if gone into on cross-examination, but can go into on direct the reduction, the time, and the revocation aspect of it?

THE COURT: And the fact that it's not known until the end really that it's the ultimate agreement, so I think beyond that there's a problem with potential vouching and that's what the [*Ish*] Supreme Court opinion discussed.

[DEFENSE COUNSEL]: I can ask about the numbers, and I can say this is what you're facing when you entered the guilty plea, you testified, this is what you potentially get—

THE COURT: Correct.

[DEFENSE COUNSEL]:—as to how much time.

[PROSECUTOR]: But if you attack his credibility at all, then I can bring in the truthfulness requirement. Is that the correct reading?

[DEFENSE COUNSEL]: Are they saying attack his credibility in any sense or is it even clear?

THE COURT: It's not entirely clear from the way it was written in here.

[DEFENSE COUNSEL]: I got it.

THE COURT: Because the way it was done, the state tried to remove the sting during their direct examination, and that that's what they said was improper because the [sting hadn't] arisen yet.

[DEFENSE COUNSEL]: So if I call him a liar, cheater, and a thief, I'm attacking him and they get to bring the truthfulness.

THE COURT: Yes.

RP at 390-91.

Mr. Jackson then testified consistently with what jurors had heard from Mr. Borgen about the robbery. He also testified that he and Ms. Cannon were friends with Aliyah. He claimed the motive for the robbery was to deter drug sales that his roommate had been making from their home by "shak[ing down] or rob[bing] the next person that came through selling drugs." RP at 400-01.

5

During direct examination, the prosecutor questioned Mr. Jackson about his agreement to plead guilty to first degree robbery and unlawful possession of a firearm. Mr. Jackson testified that in exchange for his testimony, he had "the potential" to withdraw his plea to those charges and enter a plea of guilty to a "substantially reduced charge" of robbery in the second degree and unlawful possession of a firearm in the second degree. RP at 394. He testified to the different sentences, depending on the plea: only 84 months for second degree robbery and 60 months for unlawful possession of a firearm, versus 129-171 months and a 60 month firearm enhancement for the first degree robbery charge, and 87-116 months for first degree unlawful possession of a firearm. He testified that he would not know until the end of the trial whether he would be allowed to withdraw the plea. No questions were asked by the State about Mr. Jackson's promise to testify truthfully. He did not volunteer anything on that score.

In cross-examination, Ms. Cannon's lawyer did not attempt to impeach Mr. Jackson's credibility, so truthfulness was not touched on during redirect. At no point did defense counsel question Mr. Jackson about the provisions of the plea agreement requiring him to testify truthfully.

At the conclusion of the trial, the jury found Ms. Cannon guilty of first degree robbery. She was sentenced to 200 months confinement and 18 months of community custody. The trial court imposed $2,300 in legal LFOs, commenting, "She is a young

6

woman. She has earning potential when she does get out." RP at 556. The defense did

not object. Ms. Cannon appeals.

## ANALYSIS

### *Confrontation clause*

Relying heavily on our Supreme Court's 2016 decision in *State v. Farnsworth*,

185 Wn.2d 768, 374 P.3d 1152 (2016)—a case decided after Ms. Cannon's February

2016 trial and that she contends "replaced" a "contradictory" holding of *Ish*—Ms.

Cannon argues that the trial court's rulings in response to State concerns about *Ish*

violated her right to confront and cross-examine witnesses. Reply Br. at 3; U.S. CONST.

amend. VI; WASH. CONST. art. I, § 22. Specifically, she argues that "six successive

paragraphs" of Mr. Jackson's plea agreement demonstrated the "heavy hand of the State

in coercing Jackson's testimony," providing that Mr. Jackson "must be 'truthful' in every

way at every stage of the case." Reply Br. at 4-5. The problem with this argument is not

merely that Ms. Cannon did not preserve an error by objecting in the trial court. It is that

the trial court never foreclosed cross-examination of Mr. Jackson on those matters.

Turning first to *Farnsworth*, it involved a confrontation clause issue and a witness

who had reached a plea agreement with the State, but in an entirely different context from

that presented in *Ish*. This is borne out by the fact that neither the lead opinion nor the

dissent in *Farnsworth* makes any mention of *Ish*. Unlike the situation in *Ish* and in this

7

case, where the State wants to offer evidence of a cooperating witness's promises to testify truthfully but the defense wants that evidence excluded, the defendant in *Farnsworth* wanted the plea agreement of his criminal associate to be admitted. He objected to its exclusion.

In *Farnsworth*, the defendant's partner in a first degree robbery, James McFarland, had entered pleas of guilty to first degree robbery and first degree theft. 185 Wn.2d at 791-92. McFarland faced a life sentence under the Persistent Offender Accountability Act, chapter 9.94A RCW, if convicted of robbery, a "'most serious offense.'" *Id.* at 773. His plea agreement with the State provided that the State would move to dismiss the robbery charge after hearing his trial testimony if he complied with the terms of the agreement. *Id.* at 792. During his direct examination by the State, however, McFarland mistakenly or misleadingly told jurors that under his agreement, he had been allowed to plead guilty to only first degree theft. *Id.* at 791-92. Thus, while jurors heard accurate testimony about the very significant difference in the sentences McFarland faced if convicted of theft rather than robbery, they were left with the impression that he had already received the benefit of the agreement through his guilty plea and had no ongoing incentive to testify other than truthfully.

8

The dissenting opinion, which spoke for the majority of the court on this issue,[2] observes that the State realized that attacking McFarland's credibility was critical for the defense, and "preemptively moved to exclude McFarland's plea agreement so that the defense could not cross-examine McFarland about its details." *Id.* at 791. "Defense counsel also realized this, so he opposed the State's motion to exclude McFarland's guilty plea," "argu[ing] that the guilty plea exposed inaccuracies in McFarland's testimony." *Id.* The trial court granted the State's motion to exclude the evidence because the difference in the sentencing consequences for McFarland had been fully and accurately disclosed in his testimony. It failed to consider that it remained undisclosed that McFarland could be denied the benefit of reduced sentencing unless the State was satisfied—after he testified—that he had complied with the agreement.

Ms. Cannon fastens on this line of cross-examination that Farnsworth wanted to pursue, arguing for the first time on appeal that she should have been allowed to cross-examine Mr. Jackson about his promise to testify truthfully:

> Six successive paragraphs emphasized repeatedly that Jackson must be "truthful" in every way at every stage of the case. CP 39. The fifth of these (¶ 7) emphasizes, "SAMUEL JACKSON III understands that the State will not tolerate deception from him." *Id.* The full text of the

---

[2] The four-member lead opinion found no error by the trial court on this score, and alternatively that any error was harmless. *Farnsworth*, 185 Wn.2d at 783-84. Justice Madsen concurred that the error was harmless but agreed with the dissent that the plea agreement should have been admitted into evidence and that the failure to do so amounted to constitutional error. *Id.* at 790 (Madsen, C.J., concurring).

agreement leaves no question that Jackson must please the State if he is to obtain the benefit of the plea agreement.

Reply Br. at 5. The problem is that Ms. Cannon never raised this concern in the trial court. Her position when concerns about *Ish* were being discussed with the trial court prior to Mr. Jackson's testimony was that evidence about the truthfulness provisions would be prosecutorial vouching.

It was the State that wanted to present evidence of the "testify truthfully" provisions, as the prosecutor explained:

> [I]f the Court grants defense the ability to go into the details of how much [the potential sentence] reduction is, the [S]tate's position that under *State v. Ish*, which was actually a Pierce County case, the [S]tate should be permitted to go into the restrictions on the plea agreement, and the fact that he does have to testify truthfully. He is required to take a polygraph, if requested to do so. If it's deemed he has breached the plea agreement in any way, shape, or form he's stuck with not being able to withdraw his plea and the original charges.

RP at 383-84. And it was defense counsel who responded by telling the court, "Your Honor, I will make it very simple for you. . . . [W]hen they start saying that he has to be truthful, etc., etc., etc., there is a polygraph, the [S]tate is vouching for the truthfulness of his testimony." RP at 385.

The result was the court's direction to the parties that in light of *Ish*, the State could not introduce the defendant's promises and obligation to testify truthfully in its direct examination, but the Supreme Court "did allow it in that case by way of cross-examination." RP at 390. The court's directions to the parties did not constrain cross-

10

examination at all, but only discussed the fact that a credibility attack in cross-examination could open the door for the State.

Ms. Cannon argues that if not preserved, a confrontation clause error is manifest constitutional error that can be raised for the first time on appeal. But the problem with her appeal is more fundamental. She cannot point to any error. She has not identified any limits that the trial court imposed on her cross-examination of Mr. Jackson. Nothing prevented questions to Mr. Jackson about the six sequential paragraphs dealing with truthfulness, other than an understandable tactical decision by her trial lawyer.[3]

### *LFOs*

Ms. Cannon argues the trial court did not conduct the required *Blazina* inquiry into her current and likely future ability to pay LFOs. She asks us to remand for the trial court to conduct the proper inquiry.

Although sentenced after *Blazina* was decided, Ms. Cannon made no objection to the finding that she had the present or future ability to pay. She thereby failed to preserve a claim of error. RAP 2.5(a); *Blazina*, 182 Wn.2d at 833 ("[u]npreserved LFO errors do

---

[3] Ms. Cannon raises an issue of ineffective assistance of counsel, but only that her lawyer should have objected to exclusion of evidence of the truthfulness terms. *See* Br. of Appellant at 16. Since the defense was not foreclosed from presenting such evidence, there was nothing for her lawyer to object to. She does not argue that her counsel was ineffective for failing to cross-examine Mr. Jackson about the truthfulness provisions. In light of defendants' general preference to exclude such evidence because it vouches for the credibility of an adverse witness, any challenge to effectiveness on that basis could be rejected summarily.

11

not command review as a matter of right"). "[A] defendant has the obligation to properly preserve a claim of error" and "appellate courts normally decline to review issues raised for the first time on appeal." *Id.* at 830, 834. The rationale for refusing to review an issue raised for the first time on appeal is well settled—issue preservation helps promote judicial economy by ensuring "that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Robinson*, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). A majority of the panel declines to exercise its discretion to review the issue for the first time on appeal.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, A.C.J.

12