IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37228-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ERIC RAY STALFORD, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Eric Ray Stalford appeals his convictions for first degree rape of a child and first degree child molestation. We affirm Mr. Stalford's convictions, but remand to correct scrivener's errors on the judgment and sentence form.

## FACTS

Eric Ray Stalford was charged with one count of first degree child rape and two counts of first degree child molestation based on the information that a stepson, R.H., reported to his mother, church pastors, and a forensic investigator. Each count alleged the acts occurred between December 21, 2013, and May 2, 2018.

R.H. was born in December 2009. He was nine and a half years old when he testified at trial. The State successfully admitted R.H.'s child hearsay statements into evidence.

During summation, the prosecutor focused their argument on R.H.'s credibility.
The framework of the prosecutor's argument followed the court's instruction to the jury
on credibility. The instruction read as follows:

> You are the sole judges of the credibility of each witness. You are
> also the sole judges of the value or weight to be given to the testimony of
> each witness. In considering a witness's testimony, you may consider these
> things: the opportunity of the witness to observe or know the things he or
> she testifies about; the ability of the witness to observe accurately; the
> quality of a witness's memory while testifying; the manner of the witness
> while testifying; any personal interest that the witness might have in the
> outcome or the issues; any bias or prejudice that the witness may have
> shown; the reasonableness of the witness's statements in the context of all
> of the other evidence; and any other factors that affect your evaluation or
> belief of a witness or your evaluation of his or her testimony.

Clerk's Papers at 200-01.

Relevant portions of the prosecutor's argument are reproduced below, with
emphasis given to the portions at issue on appeal:

> You are the judges of the credibility of the witnesses, okay? And I'm
> gonna argue to you that [R.H.] is a credible witness, okay? The judge has
> told you—and you get all these instructions back there (indicating), but the
> judge told you there's some things that you can look at when you are
> judging the credibility of a witness.
> If you believe that witness, what things can you take into
> consideration? The opportunity of the witness to observe or know the things
> he or she testifies about. I like to call that "you know it 'cause you lived it."
> The ability of the witness to observe accurately. Could they see? Was it
> dark? Was it light? Were they drunk? Were they high?
> The quality of a witness's memory while testifying. You can take
> that into consideration. Absolutely. The manner of a witness while

testifying. Comin' in here and sellin' somebody down the road. Oh, yeah, I got a—I got a manner about it. Any personal interest a witness might have in the outcome. A personal interest in the outcome of this case. If the witness has a personal interest.

Any bias or prejudice the witness may have shown. Do they have a motive to come in here and lie? Do they have a motive? You can take that into consideration. And the reasonableness of the witness's statements in the context of all the other evidence that was given to you.

Does their testimony seem reasonable? Is it reasonable in light of everything else you've been given in this case? *Absolutely, and I argue to you that [R.H.] was credible.*

So, let's go through a few of these things. The opportunity of a witness to observe or know the things he testifies about. *He knows because he lived it.* Eight-year-old child. Where did this happen? It happened in dark rooms. Did he ever see the penis? Maybe he didn't.

. . . .

The shaking of the penis. Shaking penis? What? Shaking the penis. Yeah, shaking it like this (indicating). Shaking it. Huh. What could that be? Well, if you're an eight-year-old little boy or if you're a nine-year-old little boy, that's how you're gonna describe it. And how can you describe it that way? Because that's what he lived through. *You cannot describe it like that unless you've lived it, and this kid lived it.*

. . . .

Remember how he told you, "He put my hand on there, and I would pull it away," and his dad would get mad. Yeah. How do you know that? How do you know that your dad would get mad if you pulled your hand away? Just makin' that out of thin cloth—or maybe that's not the right term, but just making that out of thin air? No. *That happened. That's why he knows that. Because he lived it.*

. . . .

How about the opportunity of the witness to observe or know the things he talked about? Remember when he would say, "He would come in my room before work," and his dad, "Do you want to cuddle or do you want to do something else?" Sometimes they would cuddle, but sometimes he would say, "Let's do something else, just to get him out of my face."

3

*I mean, makin' that detail up? No. That's what an eight-year-old boy would say. Credible. Credible.*

What about the ability of him to observe accurately? Remember, this happened when they were alone. Arguably most of it happened at night. When it was dark. When it was quiet. When it was just the two of them. Laying. Alone. And he gives you sensory memory, because that's how he remembers it.

. . . .

How about the quality of his memory while testifying? What do you think that number is right there (indicating): 484? It's 484 days have passed since he told his mom. Think about that. That's a long, long time in the life of a little boy.

Is he talking about this all the time? Huh-uh. Doesn't want to talk about it. Is he talkin' about it with everybody at school? No. He's not talking about it. Think about that. 484 days, and all of a sudden, "Come on up here. Let's talk about it in front of everybody here."

. . . .

What about his manner while testifying. Did that look fun to you? Was he just making this all up to get attention like you learned about? Oh, you know, he just wants a bunch of attention. He just wants to come in here and talk about this all the time, and talk about it with everybody. All you all are lookin' at him. All the people in the courtroom were lookin' at him.

. . . .

Was there any personal interest that the witness may have in the outcome? Was there any motive brought out for this kid to be dishonest to you? Anything? I mean, I'm—I'm trying to wrack my brain. Oh. That's right. That's right. He was upset about his little brother being born so he's making this up about his dad. So—okay. I'm not sure where that goes.

I don't know, ladies and gentlemen. Were there any adults who have an interest in him being dishonest? I mean, when you think about it, kid's tellin' the truth, kid's lyin', or maybe some adult's gettin' this kid to lie. Any adults around him that want to sink this guy (indicating)? That are like, "Okay, [R.H.] You know, you gotta go in there and you gotta say X, Y, Z, P, D, Q, because this guy's gotta go down. So, this is why and this is why."

No. Everybody—nothing like that came out. Nothing. He loves his dad. He lost his dad also, and he understands that, and he understood it from

4

the very beginning. *How would an eight-year old come up with all of this? It's impossible. Impossible.*

Was any bias or prejudice shown? Does he hate his dad? Did he want his dad to get in trouble? Did any of that come out? Huh-uh.

How about the reasonableness of his testimony in light of everything else that you heard in this case? Okay. So, not just him, but what else you've learned? They didn't have a great sex life after the kid was born. Now, don't get me wrong. Every marriage that has a bad sex life does not mean that this happens. I'm not saying that this is the smoking gun. Don't—don't—but it's a little piece of something, and it does make sense because the sexual abuse started after [R.H.'s brother] was born. Something to think about. Just a little piece of the puzzle.

Is it reasonable how it came out? It was spontaneous. "That looks like semen." Complete spontaneous disclosure. Completely spontaneous. No one's questioning him. Spontaneous. And then mom began to ask how her eight-year-old child knows about semen, and that's how this all came out. It was spontaneous.

*And when his mom asked, he told the truth. He told the truth.* He also told several important people in his life. Told Pastor Mel. Okay. Now, if you're a little eight-year-old boy in Sunday school and you're actin' up with Jacob—and I forget the other kid—what happens? You go see Pastor Mel.

. . . .

Pastor Mel was an authoritative figure in this little boy's life. Pastor Mel also knew the defendant. Pastor Mel talked to this kid, and before he talked to this kid he told him, "You are not in any trouble. Your mom has told me you're not gonna get in any trouble. I just need to know that you are telling the truth."

. . . .

And I also want you to think about the type of abuse he endured. Does that make sense? Does it make sense that you would begin to trust a child, get him to gain your trust, and that abuse starts slowly with touching on the outside of the clothes? Yeah. Of course that makes sense.

. . . .

Remember where it happened. The campouts. He called it "our special time." *You can't make that up.* His room. Their room. Places that

they could be alone. Think about where [R.H.] describes it happening. *It makes sense in light of all the other evidence that you've heard.*

Remember that he wanted to keep baby out of the room. Remember that he would—that [R.H.] told you, "He wanted me to go check on mom to see if she was asleep so we could have our special time." *How do you make that up unless it happened to you? You can't. You cannot. Because that's exactly what his dad told him.* And he remembers getting up and going to check if his mother was asleep.

. . . .

Remember when he—"Hey, [R.H.]. You ever lie?" "Yep, I've lied." How truthful is that? Yeah, he's lied. "What was—[R.H.], tell me about one of your lies?" "Well, one time I took four Skittles when I was supposed to take two." That's it? Okay. Lied?

. . . .

One thing about this kid is he's a rule follower. "We're not supposed to talk about the case. You know, we're not supposed to talk." This is a rule-follower kid. *Yeah, kids fib, but eventually they end up tellin' the truth.*

4 Report of Proceedings (Aug. 30, 2019) at 784-87, 789-98 (emphasis added).

The prosecutor used a PowerPoint presentation to accompany summation. A section of the presentation was entitled "CREDIBILITY." Ex. 8 at 10. Within this section there were 11 slides, each with the heading, "[R.H.] = Credible." *Id*. at 11-21. Below each of the headings was a bullet point, quoting a portion of the court's instruction on credibility. For example, the first of the eleven slides had the bullet point: "The opportunity of the witness to observe or know the things he testifies about." *Id.* at 11. Below the bullet point on each slide was a list of facts or issues in support of the

6

applicable language from the instruction on credibility. For example, regarding a

witness's opportunity to observe or know things, the slide contained the following list:

- Was it dark in those rooms? See penis?
- What did he know? Sensory memory Gross, sticky itchy, hairy [. . .]
- Body positions [. . .] Down there [. . .] I'm up here
- Shaking the penis—used his hand to show
- Blanket on the floor
- Remember his arm in his bedroom
- Pulled his hand away—Dad would get mad
- Left his hand there—then it got wet. How? from dad

*Id.*

Mr. Stalford never objected to the State's argument or its PowerPoint slides. The

jury convicted Mr. Stalford as charged. He timely appeals.

ANALYSIS

*Prosecutorial misconduct*

Mr. Stalford contends the prosecutor committed misconduct in summation by

vouching for R.H.'s credibility. Because there was no objection, relief turns on whether

the prosecutor's comments were so flagrant and ill intentioned that they could not be

adequately addressed by a curative instruction. *State v. Korum*, 157 Wn.2d 614, 650,

141 P.3d 13 (2006) (plurality opinion). Here, the standard is not met.

It is important to clarify what vouching is and what it is not. Vouching occurs

when a prosecutor provides personal assurances about the credibility of a witness or the

7

merits of a case. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality

opinion). It can also happen when the prosecutor suggests information outside the record

supports its theory of the case. *Id*. The prohibition on vouching does not prevent the

prosecutor from arguing their case. The prosecutor can argue a witness's credibility,

including explaining why a witness should or should not be believed. Especially when

there is no objection at trial, relief based on improper vouching is unwarranted unless it

is "'clear and unmistakable'" that a prosecutor is inserting their personal opinion into the

case. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*,

40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Viewed in context, the prosecutor's arguments in Mr. Stalford's case were

presented as reasons for why the jury should find R.H. credible; the prosecutor was not

expressing a personal belief. The prosecutor's assertion that it was "impossible" for R.H.

to make up his version of events, for instance, was based on the evidence that R.H., as

an eight-year-old at the time he reported the abuse, had no personal interest in lying

about Mr. Stalford. The prosecutor linked this statement to R.H.'s frequent expressions

of (1) fear about losing his biological father and (2) love for his stepfather during the time

of the abuse. Arguing it was "impossible" for R.H. to lie about the abuse under those

circumstances was an overstatement if taken literally, but not misconduct.

Our review of the prosecutor's PowerPoint presentation shows it was also properly presented as argument, not an expression of opinion. Each slide containing the heading "[R.H.] = Credible" listed evidence supporting R.H.'s credibility. The slides did not amount to vouching.

While some of the prosecutor's words could be viewed as vouching if viewed in isolation, context made the purpose clear. The fact that Mr. Stalford's attorney did not object bolsters our conclusion that the prosecutor made no clear and unmistakable statements of personal opinion. There was no misconduct, let alone misconduct sufficient to warrant reversal under the applicable standard of review.

*Scrivener's error in judgment and sentence*

The parties agree Mr. Stalford's judgment and sentence contains several scrivener's errors regarding the dates of his current offenses and the sentencing date for several of his prior offenses. They also agree these errors should be corrected on remand. We accept this concession. *See State v. Coombes*, 191 Wn. App. 241, 255, 361 P.3d 270 (2015).

No. 37228-6-III
*State v. Stalford*

CONCLUSION

The convictions are affirmed. This matter is remanded for correction of scrivener's errors in the judgment and sentence.[1]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:

_____
Siddoway, J.

_____
Fearing, J.

---

[1] The jury found Eric Stalford committed the current offenses between December 21, 2013 and May 2, 2018. The date of entry of the judgment of conviction and sentence for each of the prior Oregon convictions was March 9, 1999.