# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48060-3-II |
| Respondent, | |
| v. | |
| CHRISTOPHER WILLIAL NEWLEN aka CLIFTON CHRISTOPHER NEWLEN, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Christopher Willial Newlen, aka Clifton Christopher Newlen, appeals his jury trial conviction for second degree assault. He argues that the prosecutor engaged in prosecutorial misconduct by allowing opinion testimony from a law enforcement officer and by presenting several improper arguments in closing argument. He also argues that defense counsel's failure to object to these alleged instances of prosecutorial misconduct was ineffective assistance of counsel. In addition, Newlen also raises issues related to the imposition of appellate costs. Because Newlen fails to establish any improper conduct or improper conduct that could not have been obviated by a proper curative instruction, his prosecutorial misconduct and ineffective assistance of counsel claims fail. Accordingly, we affirm Newlen's conviction. A commissioner of this court will consider whether to award appellate costs in due course. RAP 14.2.

FACTS

I. BACKGROUND

Newlen[1] and Tom Hug owned adjoining property that appeared to be separated by a three-to-four-foot high chain link fence. Although the fence between the properties had been standing for at least 40 years, Hug and Newlen periodically disagreed about whether the fence was the true property boundary.

In August 2014, Hug agreed to sell his property and the mobile home on the property to Jim and Jeanie Brissett.[2] On August 6, Brissett and some of her family visited the property while Hug was working on the mobile home.

According to Brissett, when she was in the fenced area near Newlen's property, Newlen, who was walking with a cane, entered Hug's property and approached her. When Brissett told Newlen that she was in the process of buying Hug's property, Newlen told her that some of the property was his and that he was "gonna be taking that back." Report of Proceeding (RP) (June 11, 2015) at 81. He stated that he had already started taking down the fence and pointed to an area where the fence had been cut. Feeling "intimiadat[ed]" and wanting to get away from Newlen, Brissett responded, "Okay." RP (June 11, 2015) at 81. Brissett assumed Hug would resolve the property line issue with Newlen.

---

[1] At the time of trial, Newlen was 74 years old. He suffered from acute arthritis, diabetes, and other ailments, and used a cane to walk.

[2] The Brissetts were purchasing the property from Hug on a contract.

Upon returning to the mobile home, Brissett told Hug about her contact with Newlen. Newlen was not near the fence at that time. A while later Brissett went back outside and noticed that Newlen had returned. She observed that Newlen was cutting the fence with a pair of bolt cutters from his side of the fence. Brissett sent her son to tell Hug.

According to Hug, he then confronted Newlen at the fence. At this point, Newlen and Hug were on opposite sides of the fence, about three feet apart. When Hug asked Newlen what he was doing, Newlen responded that because Hug had sold his property, Hug's parcel no longer included an area on Hug's side of the fence that had been previously acquired through adverse possession. Hug told Newlen that he was wrong, and Newlen started to cuss at Hug and call him names.

When Newlen rested the bolt cutters on the fence. Hug told Newlen to take his tools off the fence and pushed the bolt cutters off of the fence. In response, Newlen told Hug to "get [his] hands off his tools" and then swung the bolt cutters at Hug.[3] RP (June 11, 2015) at 119. Brissett also observed Newlen raise the bolt cutters and swing them at Hug. The bolt cutters struck Hug in the back causing a chest wall injury and breaking three ribs. Hug walked away and called the police.

Sergeant Cory David Huffine responded to the call, and Hug and Brissett provided Sergeant Huffine with written statements. Sergeant Huffine also talked to Newlen, and Newlen reviewed and signed a sworn statement written by Sergeant Huffine.

---

[3] Hug later testified that he was unsure whether Newlen pulled the bolt cutters back before swinging at him.

## II. PROCEDURE

The State charged Newlen with second degree assault.[4]  The case proceeded to a jury trial.

### A. TESTIMONY

Brissett, Hug, and Sergeant Huffine testified as described above for the State.[5]  Newlen was the only defense witness.

#### 1. Brissett

In addition to the facts set out above, Brissett testified that Newlen did not ask her for permission to cut the fence and that she did not tell him he could "reclaim" the property or that she was willing to mark the new boundary or build a new fence.  RP (June 11, 2015) at 82.  Brissett also denied telling Sergeant Huffine that Newlen was on his side of the fence when he first approached her.

As for the assault, Brissett testified that she saw Hug and Newlen talking at the fence "for just a second;"[6] then she saw Newlen resume cutting the fence.  RP (June 11, 2015) at 84.  She next saw Hug push the bolt cutters off the fence and observed Newlen "raise the bolt cutters up and swing 'em at [Hug]."  RP (June 11, 2015) at 101.  She stated that when Newlen struck Hug, it did not look like Newlen accidentally swung the bolt cutters as he was falling; instead, it looked like Newlen "pulled back and swung at [Hug]" intentionally.  RP (June 11, 2015) at 85.

---

[4] The State also charged Newlen with a deadly weapon sentencing enhancement.  The trial court dismissed the enhancement, and it is not at issue in this appeal.

[5] Hug's treating physician also testified about Hug's injuries, but the physician's testimony is not relevant to the issues on appeal.

[6] Brissett testified she was unable to hear what they were saying.

During cross-examination, defense counsel had Brissett identify and review the written statement she gave Sergeant Huffine and asked her if it refreshed her memory about whether Hug made a phone call after the assault; she testified that it did not. The written statement was not admitted, and Brissett did not testify about the rest of her statement.

2. Hug

Hug testified that, although he could not tell for certain that Newlen had pulled the bolt cutters back before striking him, he "belive[d] it was definitely intentional." RP (June 11, 2015) at 120. When the State asked Hug why he believed Newlen had intentionally struck him, Hug responded, "Because he's been aggravated with me for years . . . ever since he moved out there, because I wouldn't give in to him." RP (June 11, 2015) at 120. Hug also testified that he did not see Newlen lose his balance and that he never observed Newlen struggling to pick up the bolt cutters.

3. Sergeant Huffine

Sergeant Huffine testified that when he responded to the 911 call, he first contacted Hug. Hug "told [Sergeant Huffine] that he had been struck by Mr. Newlen with a pair of bolt cutters." RP (June 11, 2015) at 140. Without giving specifics, Sergeant Huffine testified that Hug told him what had happened, showed him where the incident had occurred, and told him that Brissett had also witnessed the incident. Sergeant Huffine further testified that he also spoke to Brissett.

Sergeant Huffine also testified that Hug and Brissett provided him with written statements. On cross-examination, Sergeant Huffine agreed that Brissett had told him that Newlen was on the "outside" of the fence when she first talked to him. RP (June 11, 2015) at 147-48. But Sergeant Huffine did not otherwise testify about the content of Brissett's or Hug's statements.

5

Sergeant Huffine also testified about his contact with Newlen. He testified that Newlen showed him the bolt cutters, he photographed the bolt cutters, and he took them into evidence. After Sergeant Huffine showed the bolt cutters to the jury, the following testimony took place:

Q [State]      And did he—did you get a statement from [Newlen]?
A [Sergeant Huffine]  Yes, I did.
Q      After this, what did you do?
A      After I took his statement?
Q      Yeah.
A.      *I arrested him for assault*.

RP (June 11, 2015) at 147 (emphasis added). Newlen did not object to this testimony.

On re-direct, Sergeant Huffine testified that he did not observe Newlen have any trouble walking and that, although the bolt cutters were heavy and unwieldy, Newlen was able to hold up the bolt cutters when he (Sergeant Huffine) photographed them. Sergeant Huffine also testified that when he interviewed Newlen, Newlen described struggling with Hug over the bolt cutters after Hug grabbed them.

4. Newlen

Newlen testified that when he first met Brissett at the fence, he remained on his side of the fence. Newlen stated that when Brissett told him she was purchasing Hug's property, he asked her if Hug had mentioned anything to her about the boundary dispute and she said Hug had not. Newlen stated that after he told Brissett about wanting to remove the fence, she suggested she would be willing to relocate the fence if Newlen showed her the property line. He further testified that he did not have the bolt cutters with him when he first contacted Brissett and he did not start cutting the fence until after his conversation with Brissett.

6

As to the assault, Newlen stated that Hug approached him while he was cutting the fence and asked him, "Do you feel like going to jail today?" RP (June 12, 2015) at 40. Newlen responded, "Sure, why not?" RP (June 12, 2015) at 41. Newlen testified that Hug then "charged" at him and raised his arm and swung, hitting the bolt cutters, which Newlen was still holding, and knocking them off the fence. As Hug pushed the bolt cutters off the fence, they "swung around" and Newlen almost fell. RP (June 12, 2015) at 42. Newlen admitted that he "clipped Hug" as he (Newlen) was trying to regain his balance. RP (June 12, 2015) at 42. He asserted that he did not intend to hit Hug and stated that if he had intended to strike Hug "it wouldn't have been something so minor." RP (June 12, 2015) at 42.

The State introduced Newlen's statement to Sergeant Huffine, and the trial court admitted it as an exhibit. Newlen testified that he had reviewed and signed his sworn written statement, but he asserted that he did not write the statement. Newlen read the statement to the jury. In the statement, Newlen asserted that Hug was physically aggressive and grabbed the bolt cutters. When Newlen pulled back, Hug lost his grip and the bolt cutters accidentally hit Hug. Although he admitted to reviewing and signing the statement, Newlen testified that he did not recall telling Sergeant Huffine that he (Newlen) and Hug were struggling over the cutters.

B. CLOSING ARGUMENTS

1. State's Argument

In closing argument, the State argued that the key issue in the case was whether Newlen intentionally or unintentionally struck Hug. The State compared Newlen's and Hug's testimony and argued that Newlen's testimony was not consistent with what Brissett saw, was "not really

consistent with gravity," and was not consistent with his own statement to Sergeant Huffine. RP (6/12/17) at 115.

The State then commented,

> And, so, when we have different versions of an *event, how can you know what happened? Well, you have to examine the evidence, just like Sergeant Huffine did when he conducted his investigation.* And, so, we're going to take a look at that.

RP (6/12/17) at 115 (emphasis added).

The State then summarized the evidence, focusing on the evidence suggesting that Newlen intentionally swung the bolt cutters at Hug and Brissett's testimony that she saw Newlen "rear[ ] back and swung and hit" Hug. RP (6/12/17) at 124. The State then discussed this evidence in the context of the second degree assault elements. It argued that given the confrontational nature of Newlen and Hug's contacts; the fact Brissett, whom it characterized as "an independent witness," observed the altercation; and the inconsistencies between Newlen's testimony and his statement to the officer, the State had proved that Newlen had intentionally struck Hug. RP (June 12, 2015) at 123.

After again describing the conflicting evidence, the State argued that Newlen's version of the events, coupled with the differences between Newlen's testimony and his sworn statement, made his story "very hard to believe." RP (June 12, 2015) at 125. The State then summed up its theory, stating,

> The truth is, [Newlen] was angry when his neighbor pushed the bolt cutters, so he hit him in the side and that fractured his ribs. . . . It's not a real complicated or long event. It happened and that's the issue and—and he says different, but what he says in court is so different than what he said before and what the eye witness saw, it doesn't make sense.

RP (June 12, 2015) at 125-26. Newlen did not object to any of this argument.

2. Newlen's Argument

Newlen argued that he accidentally struck Hug. Newlen also challenged the State's characterization of Brissett as an "independent" and "unbiased" witness in part because there were discrepancies between her testimony and her statement to Sergeant Huffine and her "pre-existing relationship" with Hug, which included their shared financial interest in the property. RP (June 12, 2015) at 131.

Newlen further argued that Brissett's testimony about where Newlen was when he first contacted her was inconsistent with what she told Sergeant Huffine:

> [The State] talks about Jeanie Brissett being an independent witness. I'm not so sure that's accurate. Here testimony is inconsistent initially with what she tells Deputy Huffine. She tells Deputy Huffine Mr. Newlen talks to me from the fence line, you know, he initiates this discussion about the fence line and never tells Deputy Huffine she (sic) comes in—he comes inside the fence and in any way is intimidating or anything else.

RP (June 12, 2015) at 130.

3. State's Rebuttal Argument

In its rebuttal argument, the State emphasized credibility. For instance, the State argued,

> And you heard from Mr. Hug and you heard from Ms. Brissett and you can judge if they were up to something in the courtroom, or if the Defendant was, and that's—that's for you to decide.

RP (June 12, 2015) at 137.

The State also discussed the dispute over the property line, noting that there was "no real evidence that [Newlen's] even right about the property line." RP (June 12, 2015) at 138. The

State then commented that there was no "survey or anything else presented to tell us what the property line actually is." RP (June 12, 2015) at 138.

Immediately after this statement, the State reminded the jury that the case was "not about the property line or the fence or the law regarding who owns property within their fence." RP (June 12, 2015) at 138. It commented that taking someone's fence down is "bound to cause conflict" and that Newlen's testimony that Brissett gave him permission to cut down the fence was questionable because it seemed unlikely Brissett would casually agree to allow someone she had just met to take down the fence. RP (June 12, 2015) at 138.

The State also responded to Newlen's argument about the inconsistencies between Brissett's testimony and her statement to Sergeant Huffine, pointing out that some of what Newlen was asserting was not in evidence:

> Defense says, well, she said to Huffine about the fence line, what exactly was meant by that, who knows, or her memory of it, who knows; but the one thing is: *You didn't hear the entirety of her conversation with Sergeant Huffine. Evidence rules don't allow you to hear all of that.* She testified to what happened and Defense got a chance to cross-examine her, and *there was no—you know, that she was intimidated by him, that's not inconsistent with what she told Sergeant Huffine, that's just not evidence that was presented*.

RP (June 12, 2015) at 139 (emphasis added). Newlen did not object to any of the State's rebuttal argument.

The jury found Newlen guilty of second degree assault. Newlen appeals his conviction.

ANALYSIS

I. PROSECUTORIAL MISCONDUCT

Newlen argues that various acts of prosecutorial misconduct deprived him of a fair trial. These arguments fail.

A. STANDARD OF REVIEW

To prevail on a claim of prosecutorial misconduct, Newlen carries the burden of demonstrating that the State's comments were improper and that the comments were prejudicial. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). We review the State's allegedly improper comments in the context of the total argument, the issues in the case, the evidence presented, and the jury instructions. *Yates*, 161 Wn.2d at 774.

If the comments were improper and the defendant objected, we must consider whether there was a substantial likelihood that the statements affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). But when, as is the case here, the defendant failed to object during the closing argument, he must show that the comment was so flagrant or ill intentioned that an instruction could not have cured the prejudice. *Emery*, 174 Wn.2d at 760-61. "Under this heightened standard, [Newlen] must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

B. MISSING EVIDENCE

Newlen first challenges the following portion of the State's rebuttal argument:

Defense says, well, she said to Huffine about the fence line, what exactly was meant by that, who knows, or her memory of it, who knows; but the one thing is: *You didn't hear the entirety of her conversation with Sergeant Huffine. Evidence rules don't allow you to hear all of that. She testified to what happened and Defense got a chance to cross-examine her*, and there was no—you know, that she was intimidated by him, *that's not inconsistent with what she told Sergeant Huffine, that's just not evidence that was presented*.

RP (June 12, 2015) at 139 (emphasis added). Newlen did not object below to the argument, "evidence rules don't allow you to hear all of that," but he now argues that this argument amounted to misconduct because it told "the jury that there was evidence [the jury was] not being allowed to hear because of 'evidence rules' while at the same time implying the 'missing' evidence would support the prosecution's case." Br. of Appellant at 15-17.

A prosecutor can improperly vouch for a witness if he or she "indicates that evidence not presented at trial supports [a] witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Thus, if the State's reference to "[e]vidence rules don't allow you to hear all of that," implies that there was evidence that would have supported the assertion that Brissett never told Sergeant Huffine that Newlen came inside the fenced area, it was improper argument.

Even if this argument was improper, Newlen failed to object to this argument. The trial court's reiteration of the instruction[7] to the jury, that argument is not evidence and that the jury must consider only the evidence that the trial court admitted without concerning itself about the reasons for the court's ruling, would have cured any risk that the jury would have improperly assumed that the State was suggesting there was additional evidence they should consider. Because Newlen has not shown that a curative instruction would not have obviated this potential error, this prosecutorial misconduct claim fails.

---

[7] Clerk's Papers at 65 (Jury Instruction 1).

12

C. ELICITING "OPINION" TESTIMONY AND ARGUMENT RELATED TO "OPINION" TESTIMONY

Newlen next argues that the State engaged in prosecutorial misconduct by eliciting improper opinion testimony from Sergeant Huffine that reflected on the witnesses' credibility and Newlen's guilt.[8] Br. of Appellant at 15, 17. Newlen asserts that the State's questions elicited Sergeant Huffine's testimony that he "arrested" Newlen after his investigation and that this was improper opinion testimony about the witnesses' credibility and Newlen's guilt, apparently because this testimony implied that Sergeant Huffine found Hug and Brissett more credible. Newlen further argues that this error was compounded by the State's later closing argument drawing the jury's attention to this testimony. Br. of Appellant at 18. Even assuming that eliciting opinion evidence can be the basis of a prosecutorial misconduct claim, these arguments fail because the State's question did not elicit opinion testimony.

First, the State asked Sergeant Huffine only what he did after he took Newlen's statement. The State was questioning Sergeant Huffine about his investigative process, it did not ask him to comment on whether he believed Newlen or any other witness or which witnesses he found more credible. *See* RP (June 11, 2015) at 147.

Second, Sergeant Huffine's response did not amount to opinion testimony. Opinion testimony as to the guilt of the defendant invades the exclusive province of the jury and may be reversible error because it violates the defendant's right to a trial by jury. *State v. Kirkman*, 159

---

[8] We note that Newlen does not directly challenge Sergeant Huffine's testimony—he raises the issue only in the context of his prosecutorial misconduct and its related ineffective assistance of counsel claims. Furthermore, even if Newlen was directly challenging Sergeant Huffine's testimony, we would conclude, as we do below, that it was not improper opinion testimony.

Wn.2d 918, 927, 155 P.3d 125 (2007). In deciding whether testimony is impermissible opinion as to guilt, we consider the circumstances of the case, including "'(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" *Kirkman*, 159 Wn.2d at 928 (internal quotation marks omitted) (quoting *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001)).

We hold that under these factors, Sergeant Huffine's testimony was not an opinion as to Newlen's guilt. Although Sergeant Huffine was a law enforcement officer, whose testimony may carry a certain "aura of reliability,"[9] the State was questioning Sergeant Huffine about the investigation process and the evidence he obtained during the investigation. The State did not ask Sergeant Huffine to give his opinion as to credibility or Newlen's guilt, and Sergeant Huffine did not testify as to who he found more or less credible. Although the nature of the charges and the type of defense place credibility at issue, the lack of any direct comment on credibility or guilt and the context of Sergeant Huffine's statement make it unlikely the jury would perceive this brief testimony as Sergeant Huffine's opinion of guilt. Furthermore, this testimony did not introduce any information that the jury was not already aware of—that Newlen had been arrested and charged with second degree assault—given that Newlen was on trial for second degree assault.

Newlen further argues that this error was compounded when the State argued that it was the jury's job to "examine the evidence, just like Sergeant Huffine did when he conducted his investigation," suggesting that the jury should view the evidence the same way Sergeant Huffine

---

[9] *Kirkman*, 159 Wn.2d at 928-29.

did. Br. of Appellant at 18. Although the State mentions Sergeant Huffine's investigation *process*, it does not urge the jury to come to the same *result*. This argument was not improper.

Because Newlen fails to show that the State's question was intended to elicit improper opinion testimony from Sergeant Huffine or that the State's argument was improper, this prosecutorial misconduct claim fails.

D. BURDEN OF PROOF

Newlen next argues that the State engaged in misconduct by "misleading the jury as to the burden of proof" by commenting in its rebuttal argument that there was "no real evidence" as to whether Newlen was correct about where the property line was actually located" which argument impermissibly shifted the burden of proof. Br. of Appellant at 20. Again, we disagree.

The State commits misconduct by misstating the law regarding the burden of proof. *State v. Fleming*, 83 Wn. App. 209, 213-14, 921 P.2d 1076 (1996). Although the State commented that there was "no real evidence that [Newlen was] even right about the property line," such as a survey or other proof of the property line location, the State did not argue that such proof from Newlen, or anyone else, was required here. Instead, taken in context, the State argued that because the property line was an important issue, it was unlikely that Newlen's characterization of his first encounter with Brissett was accurate because it would be unusual for someone to so casually concede an important property right. RP (June 12, 2015) at 138-40. In fact, the State was careful to comment that "this case is *not* about the property line or the fence or the law regarding who owns property within their fence." RP (June 12, 2015) at 138 (emphasis added). Accordingly, Newlen has failed to show that this argument was improper and he does not establish prosecutorial misconduct on this ground.

E. "FALSE CHOICE" AND "TRUTH" ARGUMENTS

Finally, citing to various parts of the State's closing and rebuttal argument, Newlen argues that the State engaged in misconduct by "misleading the jury as to . . . the jury's proper role by suggesting that the jurors had to decide which side was lying in order to decide the case." Br. of Appellant at 20. Again, we disagree.

It is improper for the State to argue that it is the jury's task to choose between competing stories or decide who is telling the truth in order to render a verdict. *State v. Wright*, 76 Wn. App. 811, 825-26, 888 P.2d 1214 (1995), *superseded by statute on other grounds*, Laws of 1995, ch. 316, sec. 1. This argument misrepresents the jury's true role—determining whether the State has met its burden of proof. *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009).

Newlen first objects to the following portions of the State's argument:

> And, so, when we have different versions of an event, how can you know what happened? Well, you have to examine the evidence[.]

RP (June 12, 2015) at 115.

> And you heard from Mr. Hug and you heard from Ms. Brissett and you can judge if they were up to something in the courtroom, or if the Defendant was, and that's—that's for you to decide.

RP (June 12, 2015) at 137. These arguments, taken in context, merely stated that to resolve the case the jury had to examine the competing evidence and reminded the jury that it was its role to make credibility determinations.

Furthermore, the reference to whether the witnesses were "up to something in the courtroom," was, at least in part, in response to Newlen's argument that Brissett and Hug shared an interest in the property, so Brissett was not an "independent" or "unbiased" witness. RP (June

12, 2015) at 123-24, 130-31. Newlen does not demonstrate that these arguments were improper, so he cannot establish prosecutorial misconduct on this ground.

Finally, Newlen objects to the following argument:

> The *truth* is, [Newlen] was angry when his neighbor pushed the bolt cutters, so he hit him in the side and that fractured his ribs.

RP (June 12, 2015) at 125 (emphasis added). Newlen argues that this statement misleads the jury into thinking that it is the jury's responsibility to determine the "truth," which is not an accurate description of the jury's role because the jury is not required to determine who is lying or who is telling the truth. Br. of Appellant at 21. Newlen misconstrues the State's argument. This argument was made in the context of discussing the conflicting evidence from Hug and Newlen about how the physical contact occurred. The State was not asserting that the jury had to find the truth rather than prove the elements beyond a reasonable doubt. Thus, Newlen fails to show that this was improper argument, so he cannot establish prosecutorial misconduct on this ground.

## II. No Ineffective Assistance of Counsel

Newlen next argues that defense counsel's failure to object to the alleged improper opinion testimony and argument discussed above amounted to ineffective assistance of counsel. This argument fails.

To prove ineffective assistance of counsel, Newlen must show that (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced him, to the extent that there is a reasonable probability the deficient performance affected the outcome of the trial. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). There is a strong presumption that counsel's performance was reasonable

because of the deference we afford to defense counsel's decisions. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

In regard to the prosecutorial misconduct arguments in which Newlen fails to show that the prosecutor presented any improper testimony or argument, because the State did not commit misconduct there was no reason for defense counsel to object. *See State v. Beasley*, 126 Wn. App. 670, 687, 109 P.3d 849 (2005). In regard to Newlen's missing evidence argument, whether Brissett told Sergeant Huffine that Newlen was inside or outside the fenced area when she and Newlen first spoke was not highly relevant as to whether Newlen assaulted Hug. Thus, there was no reasonable probability that failure to object to any improper argument would have affected the outcome of the trial. Therefore, Newlen's ineffective assistance of counsel claims also fail.

### III. APPELLATE COSTS

Finally, Newlen asks us to waive appellate costs and to refuse to adopt the approach to appellate costs developed in *State v. Sinclair*, 192 Wn. App. 380, 367 P.3d 612, *review denied* 192 Wn. App. 380 (2016). Br. of Appellant at 23-24, 33-39.

Effective January 31, 2017, RAP 14.2 was amended to allow our commissioners to examine requests for appellate costs.[10] The amended rule provides in part:

> A commissioner or clerk of the appellate court will award costs to the party that substantially prevails on review, unless the appellate court directs otherwise in its decision terminating review, *or unless the commissioner or clerk determines an*

---

[10] The amended rule became effective after the briefing was filed in this appeal. Neither party has submitted any supplemental briefing addressing the amended rule.

*adult offender does not have the current or likely future ability to pay such costs.*
When the trial court has entered an order that an offender is indigent for purposes
of appeal, that finding of indigency remains in effect, pursuant to RAP 15.2(f),
unless the commissioner or clerk determines by a preponderance of the evidence
that the offender's financial circumstances have significantly improved since the
last determination of indigency. The commissioner or clerk may consider any
evidence offered to determine the individual's current or future ability to pay.

Because RAP 14.2 applies, we need not address Newlen's concerns about *Sinclair*.
Instead, a commissioner of this court will consider whether to award appellate costs in due course
under the newly revised provisions of RAP 14.2 if the State decides to file a cost bill and if Newlen
objects to that cost bill.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the
Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,
it is so ordered.

SUTTON, J.

We concur:

JOHANSON, P.J.

MELNICK, J.