IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 80476-6-I |
| Respondent, | DIVISION ONE |
| v. | |
| KEVION MAURICE ALEXANDER, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — A jury found Kevion Alexander guilty of first degree murder and two counts of witness tampering. Alexander appeals, claiming (1) prosecutorial misconduct, (2) evidentiary error about an adoptive admission, (3) violation of CrR 2.3(d), (4) erroneous admission of historical cell cite location information, and (5) denial of his right to present a defense. For the reasons discussed below, we affirm.

## I. BACKGROUND

Alexander and Mykalla James dated. During their relationship, James met Andre Aber-Williams through Snapchat. James and Aber-Williams talked over the phone for a few months. In January 2017, Aber-Williams agreed to meet in person to discuss potential employment opportunities for James.

According to James's testimony: Aber-Williams met her outside her apartment building sometime after 8 p.m. and they sat and had a conversation. At one point, Aber-Williams drove to Kent and she accompanied him in his dark green Tahoe. They returned to her apartment complex and again sat outside

Citations and pin cites are based on the Westlaw online version of the cited material.

talking until Aber-Williams decided to leave. As Aber-Williams got into his Tahoe, Alexander appeared and shot him from behind. Alexander got into the Tahoe, on top of Aber-Williams's body, drove away, and returned without his body. Alexander then instructed James to follow him in her car, a white Buick, and left the complex driving the Tahoe. She followed as instructed and Alexander drove the Tahoe to his friend Wesley Dade's house.

Various security camera footage shows a white Buick following a dark green Tahoe through town and getting into the turn lane for Dade's street.

The next day, around 2 a.m., a security guard at James's apartment complex discovered Aber-Williams's lifeless body on the ground. The body was missing jewelry, and one of the pant pockets was turned inside out. The guard called the police.

That night, firefighters discovered the Tahoe on fire and abandoned about a third of a mile from Dade's house. They quickly extinguished the fire and damage to the car was minimal. They found blood inside the car. Law enforcement theorized that someone shot Aber-Williams from the back seat. The Tahoe was missing a stereo system and amplifier.

A week after the death, law enforcement discovered that Dade pawned an amplifier of the same brand as the one that was likely in the Tahoe. Alexander accompanied Dade during the transaction. Law enforcement arrested Alexander, James, Dade, and Dade's then-girlfriend, Antoinette Brown.

During her initial interview, James claimed that on the night in question Aber-Williams had driven off to run an errand and never returned. But as evidence against her mounted, she implicated Alexander. The State charged James with rendering criminal assistance and she entered into a use-immunity agreement to testify against Alexander. The State charged Alexander with first degree murder and two counts of witness tampering.

At trial, Alexander presented a defense theory that James, desperate for money, shot Aber-Williams. A jury found Alexander guilty as charged. He appeals.

## II. ANALYSIS

### A. Prosecutorial Misconduct

Alexander says that the prosecutor committed misconduct in several ways. The State responds that its comments were proper and that Alexander waived most of his arguments. We conclude that reversal is unwarranted on this ground.

We review allegations of prosecutorial misconduct for abuse of discretion. State v. Koeller, 15 Wn. App. 2d 245, 260, 477 P.3d 61 (2020), review denied, 197 Wn.2d 1008 (2021). "A trial court abuses it discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State v. Ramirez, 7 Wn. App. 2d 277, 286, 432 P.3d 454, review denied, 193 Wn.2d 1025 (2019).

A prosecutor must ensure that they do not violate a defendant's right to a constitutionally fair trial. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). To establish misconduct, the defendant bears the burden of first showing that the prosecutor's comments were improper. State v. Boyd, 1 Wn. App. 2d 501, 517–18, 408 P.3d 362 (2017); State v. Emery, 174 Wn.2d 741, 759, 278 P.3d 653 (2012).

> Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced under one of two standards of review. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice.

Emery, 174 Wn.2d at 760–61 (citation omitted). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011). If defense counsel fails to object to allegedly improper comments made by a prosecutor, it "strongly suggests" that the comments "did not appear critically prejudicial to [the defendant] in the context of the trial." State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (emphasis omitted) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

1. Comments about James

Alexander says that, during the State's direct and redirect examinations of James, the prosecutor committed misconduct by improperly vouching for her credibility. He contends that by referencing the use-immunity agreement, the prosecutor suggested that James was telling the truth. He also says that, during closing argument, the prosecutor referenced facts not in evidence by noting that James would face her own jury. The State responds that Alexander waived these arguments and that its comments were not improper. We conclude that no ground for reversal exists here.

"Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).

a. Use immunity agreement

During its direct examination of James, the State asked whether she had been charged with a crime related to the case, and she responded that she had been charged with rendering criminal assistance. The State then asked whether she had entered into any agreement with the State and she responded that she had. She explained her understanding of the agreement: "If I testify that it won't—I will have immunity for my case; so whatever I say won't get rolled over to my case." The State then clarified that she had use immunity, which precluded the State from using her testimony in this case against her in her own

case; she confirmed this was correct.  The State did not inquire on direct examination about a requirement in the agreement that James tell the truth. Alexander did not object to any of these questions.

During cross-examination of James, defense counsel raised the use-immunity agreement multiple times and asked her about how she benefitted from it.  The defense then asked her whether the agreement required her to be honest, to which she responded "yes."  In questioning her credibility, the defense mentioned the requirement for truthfulness several more times.  The defense then offered the written agreement into evidence, including the portion requiring James to "answer all questions about her involvement in these crimes, and the involvement of any accomplices, completely and truthfully."  The defense also questioned her about a call between her and Alexander in which she suggested that if he got out of jail, she would go to jail instead.

On redirect, the State asked James about the call with Alexander and why she thought she would go to jail if he got out.  She responded, "Basically, if I come up here and either recant my statement or try to tell another statement, then it would it seem like I was lying the whole time, and I would go to jail versus he would get out because he didn't do nothing."  Alexander did not object.

In Ish, our Supreme Court held that a prosecutor committed misconduct during its direct examination of a witness by referencing a requirement in an immunity agreement that the witness testify truthfully.  170 Wn.2d at 199 ("where the credibility of the witness had not previously been attacked, referencing

6

Otterson's out-of-court promise to testify truthfully was irrelevant and had the potential to prejudice the defendant by placing the prestige of the State behind Otterson's testimony"). The court noted that "[e]vidence that a witness has promised to give 'truthful testimony' in exchange for reduced charges may indicate to a jury that the prosecution has some independent means of ensuring that the witness complies with the terms of the agreement." Id. at 198. The court noted that this is particularly indicative of improper vouching if it occurs during the prosecutor's direct examination of a witness. Id. The court said, "A defendant may, however, impeach a witness on cross-examination by referencing any agreements or promises made by the State in exchange for the witness's testimony." Id. at 198–99. If this occurs, it opens the door for the prosecutor to comment on the agreement to testify truthfully on rebuttal. Id. at 199. Despite the misconduct, the court concluded that any error was harmless, partially because the defense opened the door on cross-examination and the prosecutor did not "dwell" on the issue. Id. at 200–01.

Unlike in Ish, during direct examination, the State did not reference the truthfulness requirement of the use-immunity agreement. During direct examination, the State did not ask James whether she had to testify truthfully as part of the immunity agreement and James did not mention the requirement on her own. Thus, the State did not suggest to the jury that the State had some way to ensure that James was telling the truth. Alexander was the one to raise the truthfulness requirement during cross-examination by asking her about it multiple

7

times and introducing the agreement itself into evidence.[1]  Alexander says that on redirect, by questioning James about the call, the State essentially asked her what she was worried about happening if she did not testify truthfully.  Even if the State's questioning could properly be interpreted this way, it was not improper vouching because Alexander had opened the door for the State to ask about James's agreement to testify truthfully.

      b.  Charges against James

Before closing arguments, Alexander moved in limine to preclude the prosecutor from committing misconduct in various ways including vouching for witnesses.  The trial court, noting that the language was "boilerplate," granted the motion.

During closing argument, defense counsel highlighted the immunity agreement and urged the jury not to allow James to "get away" with killing Aber-Williams.  During rebuttal, the State said:

> Now, it is perfectly understandable that you, as jurors, would want to see her sitting at this table with the Defendant.  That's a reasonable desire.  She played a significant role in this case.  But her criminal liability and her precise role is not the question for you.  This is not Mykalla James's trial.  That will be up to some different set of jurors.
>
>     And I'm asking you not to let your very reasonable desire to see everybody involved in this held accountable, to prevent you from

---

[1] The State says that because Alexander was the one to raise the truthfulness requirement and offer the use immunity agreement into evidence, the invited error doctrine bars him from arguing this issue on appeal.  See Shavlik v. Dawson Place, 11 Wn. App. 2d 250, 270, 452 P.3d 1241, review denied, 195 Wn.2d 1019, (2020) (the invited error doctrine prevents a party from affirmatively and voluntarily setting up an error that induces an action by the trial court and then challenging that action on appeal).  We decline to address the applicability of the invited error doctrine because the comments were not improper.

> finding that the State has proven beyond a reasonable doubt that the Defendant is actually the shooter here. Her time will come; she will have a different trial. This is about the Defendant's role in this trial, in this case, and he was the shooter.

Alexander did not object.

Alexander contends that the State's comments improperly vouched for James's credibility by referencing facts outside the record—specifically that James would face a different jury. The State responds that its comments were fair and proper responses to Alexander's defense argument that the State was letting James "off scot free." See State v. Gauthier, 189 Wn. App. 30, 38–39, 354 P.3d 900 (2015) (noting that prosecutors may make a "fair response" to arguments by defense counsel). The comments were questionable at best. But Alexander does not show that they were so flagrant and ill-intentioned that a curative instruction could not address any prejudice. See Emery, 174 Wn.2d at 760–61;[2] see also McKenzie, 157 Wn.2d at 53 n.2 (If defense counsel fails to object, it "strongly suggests" that the comments "did not appear critically prejudicial to [the defendant] in the context of the trial." (emphasis omitted) (quoting Swan, 114 Wn.2d at 661)). The trial court could have reminded the jury that the State's comments were not evidence or instructed it to disregard the State's comments. And "[b]ecause we presume that juries will ordinarily follow the court's instructions, such an instruction would have substantially alleviated

---

[2] Alexander suggests that his motion in limine preserved an objection to all the comments discussed above. But the purpose of the objection requirement is to ensure that the trial court has an opportunity to correct an improper comment and prevent any error or misconduct from continuing. Emery, 174 Wn.2d at 761–62. The motion in limine, which was not a specific, contemporaneous objection, does not serve that purpose. And Alexander cites no law supporting this approach to preservation.

9

any prejudice caused by the remark." State v. Klok, 99 Wn. App. 81, 85, 992 P.2d 1039 (2000).

2. Aber-Williams's family's agony

Alexander says the prosecutor improperly appealed to the passions and prejudices of the jury by referencing the victim's family's agony. The State disagrees and says he waived the issue. We conclude that this issue does not warrant reversal.

"'Mere appeals to the jury's passion or prejudice are improper.'" State v. Pierce, 169 Wn. App. 533, 552–53, 280 P.3d 1158 (2012) (quoting State v. Gregory, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006), overruled by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014)).

During closing argument the State said:

> You will, no doubt, during your deliberations spend a lot of time trying to figure out exactly what happened within those 15 minutes. And you may go round and round on that issue as many times as the Federal Way Police Department did. *You will likely never agonize over it as much as Mr. Aber-Williams' family has*.

(Emphasis added.) Alexander did not object.

This comment appears to be an appeal to the jury's sympathy. However, it was not so flagrant and ill-intentioned that a curative instruction could not address any resultant prejudice.[3] See Emery, 174 Wn.2d at 760–61.

---

[3] Cf. State v. Zellmer, No. 59228-9-I, slip op. at 32 (Wash. Ct. App. May 28, 2013) (unpublished) http://www.courts.wa.gov/opinions/pdf/592289.pdf (finding no prejudice where the prosecutor referenced the "broken hearts" of the parents of the murdered child and the defense objected to the comment); see GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions.").

3. GPS ankle monitor

Alexander says that the prosecutor committed misconduct by pointing out Dade's GPS ankle monitor during direct examination of this witness and during closing argument. He contends that this affected his right to a fair trial because it interfered with the jury's ability to make a fair assessment of credibility. The State says that Dade's resistance to testifying was relevant to his credibility and that Alexander waived the argument. We agree with the State.

Dade was reluctant to testify at Alexander's trial. Indeed, the trial court issued an out-of-state material witness warrant and law enforcement arrested him in Houston. A Texas court ordered him to appear for trial and placed a GPS ankle monitor on him. During his testimony, he contradicted earlier statements he had made to the police. The State asked him if he was wearing a GPS ankle monitor as a result of the Texas court's order to appear for this trial and Dade responded that he was. Alexander did not object to the question. And during closing, the State discussed Dade's close relationship with Alexander and noted that Dade was a reluctant witness; in doing so, the State commented that he was wearing an ankle monitor. Alexander did not object.

Alexander relies on State v. Jackson, to argue that pointing out Dade's GPS ankle monitor was misconduct. 195 Wn.2d 841, 852, 467 P.3d 97 (2020) (holding that an individualized inquiry is necessary before shackling a defendant at pretrial proceedings). But Jackson does not apply; it concerns a defendant's constitutional right to appear free of restraints. Id. As the State notes, whether

Dade was reluctant to testify is relevant to his credibility. That law enforcement had to track and arrest Dade to obtain his testimony is pertinent. Nor does Alexander establish that the prosecutor's comments were so flagrant and ill-intentioned that a curative instruction could not have addressed any prejudice. See Emery, 174 Wn.2d at 760–61.

　　4. Vouching for Brown

Alexander says that the prosecutor improperly vouched for Brown by saying she had no motive to lie. The State responds that Brown's credibility was a fair inference from evidence on the record. We agree with the State.

"Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." Ish, 170 Wn.2d at 196.

Brown testified that she conversed with Dade and Alexander shortly after the shooting during which conversation Dade and Alexander revealed to her that Alexander had shot Aber-Williams. She testified that she and Dade had broken up about two years before her testimony. She also said that she had been close to Alexander but did not have a relationship with James.

During closing argument the State said:

> Now, Antoinette Brown has no dog in this fight. She and Wesley Dade aren't together anymore. They haven't been together for a long time. They broke up in April or May of 2017. It wasn't a particularly bad break-up, or a particularly good break-up. They don't really keep in contact, and she hasn't talked to him since probably Thanksgiving.

> She said that she and Mykalla James were not friends, she said that the Defendant was like family to her, he was like an uncle to her boys, and she was close to him. There's absolutely no reason, two and a half years later, that Antoinette Brown would come in here and say something that would implicate the Defendant unless it were true.

Alexander objected and the court overruled his objection.

The comment was a reasonable inference based evidence in the record about Brown's relationships with Dade, Alexander, and James. See State v. Robinson, 189 Wn. App. 877, 893–94, 359 P.3d 874 (2015) (holding that the prosecutor did not improperly vouch for a witness when the prosecutor said that the witness had "no reason to lie" because it was a proper inference from evidence on the record). Thus, the prosecutor's comment was not improper. See State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010) ("a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence").

5.  Burden of proof

Alexander says that the prosecutor impermissibly sought to lower its burden of proof by suggesting that the government need not thoroughly investigate a crime. The State disagrees and says Alexander waived his argument. We agree with the State.

"Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." State v. Lindsay, 180 Wn.2d 423, 434, 326 P.3d 125 (2014).

13

Throughout the trial, defense counsel emphasized that no one sent swabs from Aber-Williams's Tahoe to the lab for testing. The crime lab explained that this was partly because of limited resources at the lab. During closing argument the prosecutor said:

> In a perfect world, every single item would be swabbed for touch DNA, blood DNA, breath DNA, fingerprints; they would be immediately sent to the Crime Lab; they would be tested the next day; they would be able to tell everybody's actual DNA, when the DNA was deposited there, under what circumstances it was deposited, and give you a glimpse of exactly the crime as it happened.
>
> *In reality, that is not at all the way that any of that works.* Now, to be sure, DNA and other forensics have made a lot of gains in the last decade. They do amazing things. They solve crimes every day. But not every case rises and falls on forensic evidence, every case is different, and nowhere in your entire packet of jury instructions does it tell you that there has to be DNA or fingerprint evidence for you to be *convinced of somebody's guilt beyond a reasonable doubt*.

(Emphasis added.) Alexander did not object.

Alexander contends that these comments diminished the government's obligation to prove the elements of the crime beyond a reasonable doubt. But recognition of an ideal investigatory approach and real-world constraints does not amount to reduction of the burden of proof. In fact, the prosecutor reiterated the correct standard a few moments after her comment about a "perfect world." Nor does Alexander establish that the prosecutor's comments were so flagrant and ill-intentioned that a curative instruction could not have addressed any prejudice. See Emery, 174 Wn.2d at 760–61.

6.  Cumulative error

Alexander says that the cumulative error doctrine requires reversal because this case relied heavily on the credibility of multiple witnesses who the prosecutor either improperly denigrated or bolstered. "The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal." In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). As discussed above, there were only two problematic comments: those about James facing her own jury and Aber-Williams's family's agony. And as discussed above, neither was so flagrant and ill-intentioned that a curative instruction could not have cured any prejudice. Even when considering both together, our conclusion remains the same.

B.  Adoptive Admission

Alexander says the trial court erred by admitting as an adoptive admission Brown's testimony about Dade telling her, in Alexander's presence, that Alexander shot Aber-Williams. Alexander contends that insufficient foundational facts supported the admission, and that it was prejudicial. We conclude that the trial court acted within its discretion by admitting Brown's testimony.

We "review a trial court's decision on the admission of evidence for abuse of discretion." State v. Hill, 6 Wn. App. 2d 629, 640, 431 P.3d 1044 (2018). A

trial court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or reasons. Id.

Hearsay—an out-of-court statement offered to prove the truth of the matter asserted—is inadmissible. ER 801(c); ER 802. But an adoptive admission is not hearsay, and thus may be admissible. ER 801(d)(2)(ii). A statement is an adoptive admission if it is offered against a party and is "'a statement of which the party has manifested an adoption or belief in its truth.'" Hill, 6 Wn. App. 2d at 640 (quoting ER 801(d)(2)(ii)). Adoptive admissions are considered a statement made by the person they are being offered against, even though a third party spoke them. Id.

A party can adopt a statement by words, gestures, or even by silence. Id. at 640–41. "Silence constitutes an adoptive admission only if (1) the party-opponent heard the accusatory statement or incriminating statement, (2) the party-opponent was able to respond, and (3) the circumstances were such that it is reasonable to conclude the party-opponent 'would have responded had there been no intention to acquiesce.'" Id. at 641 (quoting State v. Neslund, 50 Wn. App. 531, 551, 749 P.2d 725 (1988)). To admit a statement as an adoptive admission, a "trial court must make a preliminary determination that 'there are sufficient foundational facts from which the jury reasonably could conclude that the defendant actually heard, understood, and acquiesced in the statement.'" Id. (quoting Neslund, 50 Wn. App. at 551). Once the trial court makes the threshold determination that sufficient foundational facts exist, it is for the jury to decide

"'whether in the light of all the surrounding facts, the defendant actually heard, understood, and acquiesced in the statement.'" Id. (quoting Neslund, 50 Wn. App. at 551). Whether a statement is an adoptive admission "is 'a matter of conditional relevance.'" Id. (quoting Neslund, 50 Wn. App. at 551–52).

The day of Brown's testimony, she revealed to the State that on the night of the shooting Dade told her that Alexander had shot Aber-Williams. She had not mentioned this during interviews with law enforcement or the defense. Based on this revelation, the defense requested a voir dire of Brown, which the trial court allowed. During voir dire, Brown revealed that a few days after the shooting, in her kitchen, Alexander and Dade had a conversation with her during which they told her that Alexander had shot Aber-Williams. She did not remember the specific dialogue of the conversation; she remembered only the "nature" of it, which was that Alexander had murdered Aber-Williams. She said that the conversation was between all three of them, and that Dade did "most of the talking." The State asked what Alexander had said generally; she responded "[i]n general, he said that he had murdered Dre and drove his car into our garage." When defense counsel asked who said what, she said, "It was mostly [Dade] doing the talking and [Alexander] kind of just agreeing. And—I don't know the word I'm looking for. I mean, what he was saying was true. He wasn't denying it." The trial court determined that Brown's testimony about the conversation in her kitchen was admissible as an adoptive admission because

sufficient foundational facts existed for a jury to reasonably conclude that the defendant heard, could respond to, and acquiesced to the statement.

Brown then testified before the jury about the conversation. She said that she, Dade, and Alexander had a conversation in her kitchen during which "they revealed to [her] that [Alexander] had shot [Aber-Williams] in the head." She said that Alexander "was talking, but [Dade] was doing most of the talking. [Alexander] more so was just agreeing and wasn't denying," and that Alexander was "[k]ind of just nodding his head." The State asked her what Dade said that Alexander was "agreeing with and not denying" and Brown responded "that [Alexander] was the one who shot [Aber-Williams] in the head." She noted that Alexander was present for the entire conversation and made no indication that he was unable to understand what Dade was saying. She explained that she did not remember the dialogue or who said what but she did remember the "nature of the conversation." After this testimony, defense counsel moved to strike it and the trial court reserved ruling on the issue.

During his testimony, Dade denied having this conversation. Based in part on Dade's repudiation, Alexander again moved to strike Brown's comments. The trial court denied the motion and noted that Dade's denial of the conversation was for the jury to weigh in determining whether the inculpatory statement was an adoptive admission.

This court held in Hill, that accusatory text messages from the alleged victim were inadmissible as adoptive admissions when the defendant deflected in

response. 6 Wn. App. 2d at 645–46. The alleged victim texted the defendant accusing him of abusing her. Id. at 642–43. He did not respond to the accusations and changed the subject. Id. This court determined that the trial court abused its discretion concluding that there were sufficient foundational facts to admit the texts. Id. at 645–46. In doing so, the court noted that text messaging is a "unique form of communication" that is often "truncated" and "informal," making it hard to assess the foundational facts. Id. at 645 (quoting State v. Hinton, 179 Wn.2d 862, 873, 319 P.3d 9 (2014)).

By contrast, in Neslund, this court held that comments made by the defendant's brother in her presence were properly admitted as adoptive admissions. 50 Wn. App. at 553. A brother of the defendant testified that he heard his other brother discussing how he and the defendant had murdered the defendant's husband and disposed of the body. Id. at 537. The testifying brother said that the defendant never denied any of the statements and participated in the conversation. Id. at 553. But he was unable to remember when the conversation occurred, specify exactly who said what, and say who else was present. Id. at 552. He also acknowledged that he was intoxicated and in a different room. Id. at 552–53. This court held that the trial court acted within its discretion in determining sufficient foundational facts supported admission. Id. at 553. The court noted that "any weaknesses" in the witness's testimony "went to the weight, not the admissibility, of his testimony on this issue." Id.

Alexander analogizes to Hill, but it is distinguishable. There, the court noted the unique nature of text messages, and here the conversation was in person. And based on Brown's testimony, Alexander actively participated in the conversation and seemingly did not deflect accusations. In this way, this case more resembles Neslund, in which the defendant was present and did not deny any statements about her involvement in a murder.

Alexander highlights that Brown does not remember specifics of the conversation and that Dade denied that such a conversation occurred. But as the trial court noted, these remain matters for the jury to consider in terms of credibility when deciding whether Alexander heard the statements, could respond, and acquiesced to them. See Neslund, 50 Wn. App. at 553 ("any weaknesses" in the witness's testimony "went to the weight, not the admissibility" of it).

The trial court acted within its discretion in determining that sufficient foundational facts existed to admit the testimony. During her testimony, Brown said Alexander was present for the whole conversation, he was an active participant, he "[k]ind of" nodded, and he did not deny Dade's statements, thus showing that Alexander heard the statements, could respond, and acquiesced.[4] See State v. McCaughey, 14 Wn. App. 326, 328, 541 P.2d 998 (1975) (holding that the defendant nodding his head sufficed to establish acquiescence for the

---

[4] What Brown said during voir dire and what she said during her testimony before the jury about the conversation was largely the same. And Alexander did not object below on the ground that her comments differed, nor does he appeal on that ground.

purpose of adoptive admissions).  Also, that Brown said that Dade did "most" of the talking shows that Alexander did some as well.

C.  CrR 2.3(d) Inventory Requirement

Alexander says that the trial court erred by admitting the contents of his cell phone at trial because law enforcement did not comply with CrR 2.3(d) when they extracted data off the phone.  The State says that even if CrR 2.3(d) applies to this situation, Alexander failed to show prejudice.  We agree with the State.

We review a trial court's "findings of fact in ruling on a motion to suppress under the substantial evidence standard and review conclusions of law de novo." State v. Linder, 190 Wn. App. 638, 643, 360 P.3d 906 (2015).

CrR 2.3(d) provides that when a law enforcement officer is taking inventory of a person's property, "[t]he inventory shall be made in the presence of the person from whose possession or premises the property is taken, or in the presence of at least one person other than the officer."  When an officer does not adhere to this requirement, often the only remedy is suppression.  Linder, 190 Wn. App. at 651.  But if the violation of CrR 2.3(d) is not prejudicial, then suppression is not required.  Id.  If substantial evidence supports a finding that the inventory was accurate or if a violation can be remedied after the fact, no prejudice exists.  Id.

Law enforcement obtained a warrant to search Alexander's cell phone. An officer used software to copy data off of Alexander's cell phone with no one else present.  His phone contained a picture of Aber-Williams's driver's license.

Alexander moved to suppress his cell phone data, claiming a CrR 2.3(d) violation. During an evidentiary hearing, the officer who copied the data explained that he used software to copy it, that doing so did not alter or delete any data on the phone itself, and that the process was capable of repetition. He noted that he had never experienced or heard of a situation in which someone complained of missing data or a damaged phone after he copied their data and he saw no indication of compromised data in this case. The trial court expressed skepticism on whether CrR 2.3(d) applies to this situation, noting that copying data off a cell phone may not constitute an inventory. But the court assumed for purposes of its ruling that CrR 2.3(d) applies and denied Alexander's motion to suppress. The court found that the data on Alexander's phone remained unaltered and able to be copied again and concluded that Alexander was not prejudiced.

The court did not err in finding that one could copy the unaltered data on Alexander's phone again and concluding that he was not prejudiced. See Linder, 190 Wn. App. at 651 (noting that if a violation of the rule can be remedied, the defendant is not prejudiced). Alexander contends that data is lost "all the time" in the digital era, but he does not contend that such loss occurred here. Nor is there any indication that his data was compromised or that such losses are common in this context. The trial court did not err in denying Alexander's motion to suppress.

D. Frye[5]

Alexander says the trial court erred by denying his motion to suppress historical cell site location information because the underlying scientific theory is not generally accepted by the scientific community. The State responds that we should follow Division Three's approach in State v. Ramirez and conclude that historical cell site location information is generally accepted and was admissible in this case. 5 Wn. App. 2d 118, 136, 425 P.3d 534 (2018). We agree with the State.

Washington courts apply the Frye standard to determine the admissibility of novel scientific evidence. Id. at 136. The standard provides that "'evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.'" State v. Baity, 140 Wn.2d 1, 10, 991 P.2d 1151 (2000) (quoting State v. Martin, 101 Wn.2d 713, 719, 684 P.2d 651 (1984)). "Evidence not involving 'new methods of proof or new scientific principles' is not subject to examination under Frye." Ramirez, 5 Wn. App. 2d at 136 (quoting Baity, 140 Wn.2d at 10). "Only if a party presents new evidence *seriously* questioning continued general acceptance of use of the product rule will a Frye hearing be required." State v. Copeland, 130 Wn.2d 244, 298, 922 P.2d 1304 (1996).

We review a trial court's Frye determination de novo. Ramirez, 5 Wn. App. at 136.

---

[5] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923).

Alexander moved to suppress historical cell site location information and FBI Agent Banks's expert testimony. The trial court denied the motion, determining that the evidence did not rely on a novel scientific approach requiring a Frye hearing.

At trial, Agent Banks testified as to the following: Historical cell site analysis involves taking records maintained by cell phone providers and compiling them to get a general idea of the location of a cell phone when it made or received a call. Phones scan the cellular network for a dominant signal. Each tower has multiple sectors that are directional and typically cover a 120-degree wedge emanating out from it. Knowing the location of a cell tower and the specific sector that a phone was connected to during a call allows one to approximate a general location for the phone. But it is impossible to determine a precise location from the data. Cell site location information suggested that Alexander's phones' general geographic locations tracked the State's theory of the case—that Alexander shot Aber-Williams, drove his car to Dade's house, and disposed of it nearby.

Division Three of this court held in Ramirez that historical cell site location information is widely accepted and admissible under Frye. 5 Wn. App. 2d at 136–37. The court cited a law review article and several cases from various jurisdictions holding similarly. Id. at 136. The court noted that while controversy exists about whether a cell site analyst can pinpoint the precise location of a cell phone, Agent Banks—the same expert who testified in Alexander's trial—"was

careful to explain that her testimony provided information only of the approximate area" of the target cell phone. Id. at 137.

The use of historical cell site information here is not new and novel; it is generally accepted by the scientific community. See id. at 136–37. The evidence here is very similar to that in Ramirez—Agent Banks was again careful to specify that the analysis could produce only general geographic locations, not precise locations.

Alexander urges us to disregard Ramirez because the court cited only law review articles and case law rather than scientific sources in reaching its holding. But courts may look to various sources when deciding whether a scientific theory or method is generally accepted. See State v. Cauthron, 120 Wn.2d 879, 888, 846 P.2d 502 (1993) (examining "the record, available literature of law reviews and other journals, and the cases of other jurisdictions," in making its Frye determination). And the cases the court cited in Ramirez contain their own Frye analyses in which the courts reviewed the scientific acceptance of historical cell site location information. See e.g., United States v. Hill, 818 F.3d 289, 298 (7th Cir. 2016) (noting that the "technique has been subjected to publication and peer criticism, if not peer review" (citing Matthew Tart et al., Historical Cell Site Analysis—Overview of Principles and Survey Methodologies, 8 DIGITAL INVESTIGATION 185–86 (2012); Aaron Blank, 18 RICH. J.L. & TECH.3, at 3–5 (2011); Herbert B. Dixon Jr., Scientific Fact or Junk Science? Tracking A Cell Phone Without GPS, 53 JUDGES' J., Winter 2014, 37 (2014)).

We follow the Ramirez approach and conclude that the trial court did not err by denying Alexander's motion to suppress.[6]

E. Missing Evidence Instructions

Alexander says that the trial court denied his right to present a defense by not giving the jury missing evidence instructions. He contends that such instructions were appropriate because of law enforcement's failure to test the Tahoe for touch DNA.[7] And he claims that without missing evidence instructions, his closing argument lacked legal support. The State responds that the crime lab and law enforcement sufficiently explained law enforcement's actions and thus missing evidence instructions were unwarranted. We conclude that the trial court acted within its discretion by not giving such instructions to the jury.

When a trial court refuses to give a jury instruction based on a factual determination, we review for abuse of discretion. State v. Derri, 17 Wn. App. 2d 376, 404, 486 P.3d 901 (2021). A trial court abuses its discretion when its decision is "'manifestly unreasonable or based upon untenable grounds or reasons.'" State v. Houser, 196 Wn. App. 486, 491, 386 P.3d 1113 (2016) (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). We review de novo a claim of denial of Sixth Amendment rights. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). We may affirm a trial court's decision on "any

---

[6] Because the science is generally accepted, the trial court likewise did not err in not holding a Frye hearing. Nor did Alexander appear to have wanted one during trial.

[7] Touch DNA is DNA left behind through touch, rather than through samples such as blood, saliva, or hair.

ground the record supports." State v. Smith, 165 Wn. App. 296, 308, 266 P.3d 250 (2011), aff'd on other grounds, 177 Wn.2d 533, 303 P.3d 1047 (2013).

"The missing evidence instruction is a permissive inference instruction that informs the jury that 'where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, . . . [they] fail[] to do so,— the jury may draw an inference that it would be unfavorable to [them].'" Derri, 17 Wn. App. 2 at 404 (first alteration in original) (quoting State v. Blair, 117 Wn.2d 479, 485–86, 816 P.2d 718 (1991)). "A defendant is entitled to a jury instruction supporting [their] theory of the case if there is substantial evidence in the record supporting [their] theory." State v. Powell, 150 Wn. App. 139, 154, 206 P.3d 703 (2009). But a missing evidence instruction is "not warranted when the evidence is unimportant, merely cumulative, or when its absence is satisfactorily explained." Derri, 17 Wn. App. 2 at 404. The instruction "'should be *used sparingly*.'" Houser, 196 Wn. App. at 492 (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.20 note on use at 177).

Though law enforcement took some swabs for touch DNA from the Tahoe, they did not send those swabs in to the crime lab for testing. Law enforcement then searched the interior of the Tahoe for a spent cartridge from the murder weapon, contaminating the interior and preventing further DNA sampling. Based on the lack of touch DNA testing and evidence, Alexander requested two missing

evidence jury instructions.[8] The trial court treated the instructions like spoliation instructions, noted that there was no evidence of misconduct, and determined that the reasonable doubt instruction would allow Alexander to argue his defense theory. Throughout trial, Alexander focused on the lack of touch DNA evidence and questioned law enforcement about it.

---

[8] The first proposed instruction stated,

> If evidence that should have been preserved by the government was not, you may be able to infer that the evidence would have been unfavorable to the government in the case. You may draw this inference only if you find that:
>
> (1) The evidence is within the control of, or peculiarly available to, that party;
>
> (2) The issue for which the evidence could have been introduced is an issue of fundamental importance, rather than one that is trivial or insignificant;
>
> (3) As a matter of reasonable probability, it appears naturally in the interest of the government to preserve the evidence;
>
> (4) There is no satisfactory explanation of why the government did not preserve the evidence; and
>
> (5) The inference is reasonable in light of all the circumstances.

The second proposed instruction stated,

> If evidence that should have been tested by the Washington State Patrol Lab was not, you may be able to infer that the evidence would have been unfavorable to the government in this case. You may draw this inference only if you find that:
>
> (1) The evidence is within the control of, or peculiarly available to, that party;
>
> (2) The issue for which the evidence could have been introduced is an issue of fundamental importance, rather than one that is trivial or insignificant;
>
> (3) As a matter of reasonable probability, it appears naturally in the interest of the government to preserve the evidence;
>
> (4) there is no satisfactory explanation of why the government did not preserve the evidence; and
>
> (5) the inference is reasonable in light of all the circumstances.

A forensic scientist from the crime lab testified that the lab has limited resources and cannot test every sample taken from a crime scene, and thus it must prioritize certain samples and tests. Officer Vanderveer testified that the police department works with the lab to decide which samples to prioritize and, based on their goal of quickly identifying a suspect, they decided to search for fingerprints because doing so would be faster and less resource intensive. Vanderveer explained that searching for fingerprints can compromise DNA evidence and vice versa, so officers often make a choice between the two. A DNA scientist noted that the presence of fingerprints or touch DNA would not inform them of when a certain person was inside the car. During closing argument, Alexander highlighted the lack of touch DNA evidence placing him in the Tahoe and law enforcement's failure to obtain touch DNA evidence. Law enforcement and the crime lab satisfactorily explained the lack of touch DNA evidence. See Derri, 17 Wn. App. 2 at 404 (holding that a missing evidence instruction is "not warranted when [evidence's] . . . absence is satisfactorily explained.").

Also, the touch DNA evidence Alexander contends might have been found would be unimportant and cumulative. See id. (holding that missing evidence instruction is "not warranted when the evidence is unimportant or merely cumulative"). Alexander contends that the touch DNA evidence could have shown that he was never inside the Tahoe, where law enforcement theorized the shooting took place. But the lack of Alexander's touch DNA inside the car does

29

not necessarily establish that he was never in the car. The evidence shows that some parts of the interior had been wiped down. Alexander also says that touch DNA could have placed James inside the car. But she admitted at trial that she had ridden in the car. Perhaps touch DNA evidence could have shown that James was in the back seat, where the police thought the shooter had been, but the officers sufficiently explained why they did not send in the samples. The trial court acted within its discretion in refusing to give the missing evidence instructions, particularly given that such instructions should be used sparingly.

Alexander says the refusal to give his requested instructions deprived him of his Sixth Amendment right to present a defense. We disagree.

The Sixth Amendment[9] guarantees a defendant's right to present their defense. Jones, 168 Wn.2d at 720. Typically, a trial court's action does not deny a defendant that right unless it inhibits the defendant's "entire defense." See State v. Arndt, 194 Wn.2d 784, 814, 453 P.3d 696 (2019) (determining that the trial court did not violate the right to present a defense when the defendant was still able to advance her defense theory); Jones, 168 Wn.2d at 721 (determining that the trial court violated the right to present a defense when it prohibited the defendant's "entire defense").

The trial court did not prevent Alexander from advancing the defense theory that the missing touch DNA evidence created reasonable doubt thus requiring an acquittal. Alexander focused on the touch DNA evidence throughout

---

[9] U.S. CONST. amend. VI

30

trial and his closing argument. The trial court did not violate his Sixth Amendment right to present a defense.

We affirm.

_____ Chun, J.

WE CONCUR:

_____   _____
                          Mann, C.J.